**ROLAX et al. v. ATLANTIC COAST LINE R. CO. et al.**
Civ. A. No. 670.

United States District Court
E. D. Virginia, Richmond Division.
Feb. 23, 1950.

As Amended by Supplemental Opinion
July 18, 1950.

Joseph C. Waddy, and Charles H. Houston, Washington, D. C., Oliver W. Hill, Richmond, Virginia, and Thurgood Marshall, New York City, for plaintiffs.

Collins Denny, Jr., Richmond, Virginia, for defendant Railroad.

William G. Maupin, Norfolk, Virginia, Ralph M. Hoyt, Milwaukee, Wisconsin, for defendant Brotherhood.

HUTCHESON, Chief Judge.

This action was filed under the Railway Labor Act, Title 45, U.S.C.A., Chapter 8. The two plaintiffs, who are Negro locomotive firemen, sued individually and as representatives of all the Negro locomotive firemen employed by the defendant, Atlantic Coast Line Railway Company. In general, the basis of the complaint is that the defendant, Brotherhood of Locomotive Firemen and Enginemen, hereafter referred to as the Brotherhood, and the Atlantic Coast Line, hereafter called Coast Line, have discriminated against the Negro firemen under terms of the collective bargaining agreement entered into between the Brotherhood and the Coast Line, known as

the Southeastern Carriers Conference Agreement of February 18, 1941, by which 50% of the available firing job assignments were allocated to colored firemen and 50% to white firemen in the order of seniority between the two groups, and a collective bargaining agreement with Atlanta, Birmingham and Coast Railway, effective June 1941, under which only white firemen would be assigned jobs on diesel locomotives, which latter agreement, referred to as Article 16(p), has been abrogated, effective January 10, 1947.

On December 20, 1948, six additional Negro firemen intervened as members of the same craft or class. They will also be referred to as plaintiffs.

The relief sought is a declaratory judgment stating the rights and duties of the parties; discovery relating to agreements pending or negotiated concerning job assignments or employment rights; an injunction from the assertion of any claim or recognition of the Southeastern Carriers Conference Agreement, or any other agreement making a distinction between white and colored firemen on the ground of race or color; an injunction against the Brotherhood from acting or purporting to act as representative of the entire class or craft of firemen so long as it refuses to represent the plaintiffs and other colored firemen fairly and in good faith and to give them notice and opportunity to be heard and report on all actions adversely affecting their employment rights proposed or taken by it; compensatory and punitive damages; restoration of seniority rights; general relief; attorneys' fees and costs.

Certain motions to dismiss were filed and overruled. Responsive pleadings were subsequently filed and requests for admissions and numerous affidavits were filed.

On October 13, 1949, a written agreement was filed, which, in substance, provided that colored firemen should be permitted to qualify for service on diesel passenger engines under the same terms and conditions as white firemen, which agreement became effective on·October 11, 1949.

The introduction of evidence and argument of counsel consumed seven days.

Some knowledge of the historical background of this subject matter is helpful for an understanding of the issues involved.

Beginning with the early days of the railroad in this area, with equipment of a primitive nature, white men were employed as engineers, charged with the responsibility of operating locomotives. With some exceptions the fireman who shoveled coal into the furnace and performed other unskilled duties was a colored man. In argument it was said that in those days the requisites of a fireman were a strong back and a weak mind. So far as it conveys the idea that the fireman had little responsibility but arduous duties, the description is not inapt. This condition prevailed through the gradual development of the steam locomotive. Seniority rights were unknown and the choice of a fireman was usually left to the engineer. As might have been anticipated, there grew up a tradition of the road to the effect that only white men were employed as engineers and upon entering service the colored fireman did not expect promotion and ordinarily worked under the engineer who had selected him. The average fireman was illiterate, but reliable, and there existed a state of co-operation and mutual respect between the engineer and his fireman who occupied the cab of the locomotive during years of constant and close association. The fireman had no employment rights and ordinarily was paid less than his white counterpart.

In 1919, for the first time, the white firemen and enginemen, as a result of their organized strength, were able to obtain benefits accruing from collective bargaining and contracts of employment were entered into between the labor organizations and the railroads pertaining to hours, wages, working conditions and other terms of employment. It was then, for the first time, that the now well-recognized seniority rights were established as between the employees and the railroads. The contracts made provision for seniority rights and other benefits without regard to distinction between the white fireman and the colored fireman. So far as information of the

Court reveals, no colored fireman has ever been promoted to the position of engineer, that position being filled by white employees recruited from the ranks of firemen. Under a plan put into effect white firemen on the Atlantic Coast Line are required to take an examination for promotion to the position of engineer after approximately three years' service. The testimony of experienced railroad men, both white and colored, demonstrates convincingly the necessity of prior experience as a fireman to develop into a competent engineer. During this time white men who entered the ranks of firemen for both the purpose of present employment and obtaining necessary experience for promotion, who successfully passed the examination, were promoted, and those who failed to pass the examination were discharged from the service. As a result colored firemen in a considerable number acquired seniority rights superior to the incoming white firemen and thereby became entitled to preferred job assignments without being required to take the examination for promotion to which the white fireman was subjected, failure of which meant dismissal from the service.

During the late 1920's there had accumulated at the top of the fireman roster a large block of colored firemen, who, under the seniority rule, were entitled to preferential assignment on firing jobs and being ineligible for further promotion created a block which made it difficult for white firemen entering the service to obtain job assignments sufficient to afford firing experience necessary to become an engineer within in a reasonable time. Due to this condition an agreement was entered into between the Brotherhood and the railroad, under which ⅔ of the available firing jobs were allocated to colored firemen, who were classified as non-promotable, and the remaining ⅓ were allocated to the white firemen undergoing training necessary to become engineers. This arrangement continued, with modification in percentage until 1941, when the railroads constituting the Southeastern Carriers Association were notified by the Brotherhood of its desire to modify the bargaining contract so as to increase the ratio of promotable firemen on assigned jobs to 50%. The Carriers protested this proposal; whereupon the Brotherhood obtained the Services of the National Mediation Board and after protracted conferences the Carriers agreed to the suggested change and entered into what is known as the "Southeastern Carriers' Conference Agreement of February 18, 1941".

Prior to the acquisition by the Coast Line of the A. B. & C., an agreement was entered into on the latter road, effective June 1941, under which only white firemen would be assigned jobs on diesel locomotives. This was later modified, and as before mentioned, has now been abrogated in its entirety, effective October 11, 1949, and is here mentioned only in passing as it is not involved in this case except incidentally.

The result of the February 1941 agreement has been to deprive some of the colored firemen of job assignments to which they would otherwise be entitled by virtue of their seniority. The plaintiffs insist upon being permitted to exercise what is known as straight seniority, the result of which is to fill the greater portion of firing jobs with colored firemen to the exclusion of the white firemen. It was testified that in the absence of the ratio arrangement a white fireman entering the service would not obtain sufficient experience to become an engineer until after about ten years service instead of the present period of about three years.

A brief review of the history of other litigation of a similar nature may be helpful to a clearer understanding of the issues here involved. Some years since there was filed in the Norfolk Division of this Court an action under the short style of Tunstall v. Brotherhood, Infra, seeking to enjoin the Brotherhood and the Norfolk Southern from the enforcement of the Southeastern Carriers Conference Agreement of 1941. A similar action was brought in one of the state courts of Alabama at about the same time under the short style of Steele v. L. & N. Railroad Company, Infra.

The then District Judge before whom the Tunstall case was brought, was of opin-

ion this Court did not have jurisdiction and dismissed the complaint. That action was affirmed by the Fourth Circuit in 1944. Tunstall v. Brotherhood, 140 F.2d 35. In 1944 the Supreme Court reversed that decision in the case of Tunstall v. Brotherhood, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, and at the same time rendered its opinion in Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. The opinions of these cases should be read together. Upon remand of the Tunstall case to the Fourth Circuit for a determination of the adequacy of process, that Court held in 1945 that service was proper. Tunstall v. Brotherhood, 4 Cir., 148 F.2d 403, and remanded the case to the District Court for further proceedings. Upon remand all parties filed motions for summary judgments, supported by affidavits, and in 1946 judgment was granted the plaintiff, which had the effect of enjoining the defendants from employing the ratio of job assignments provided under the 1941 agreement, Tunstall v. Brotherhood, D.C., 69 F.Supp. 826. The action of the District Court was affirmed by the Fourth Circuit in Brotherhood v. Tunstall, 163 F.2d 289, and the Supreme Court denied certiorari on December 15, 1947.

Suit in the instant case was instituted on February 14, 1947, subsequent to the decision of the District Court in the Tunstall case, but prior to the decision of that case by the Fourth Circuit.

On the same day this suit was instituted a conference was held in Cleveland, Ohio, between representatives of the Brotherhood, representatives of the International Association of Railway Employees and representatives of the Association of Colored Trainmen and Locomotive Firemen, the last named two organizations being association of colored employees of the various roads. On February 15, 1947, counsel for the two last named organizations submitted to counsel for the Brotherhood a letter setting out certain proposals for an amicable adjustment of all disputes. On March 18, 1947, there was a further meeting held at Cleveland to discuss the proposals. These conferences were unproductive of a settlement and negotiations appear to have broken off.

Following the denial of certiorari in the Tunstall case on December 15, 1947, the Brotherhood on January 26, 1948, served on certain railroads, including the Coast Line, notice under the Railway Labor Act, proposing a modification of the existing agreement which would eliminate those portions of that agreement which make a distinction between white firemen as promotable and colored firemen as non-promotable. The proposal contemplated the elimination of all provisions which limit in any manner the exercise of seniority rights by firemen and a requirement that each fireman be called in seniority order and required to take an examination for promotion to the position of engineer. The effect would be to place both groups of firemen upon a basis of equality respecting employment. Shortly thereafter a complaint was filed in the District Court for the District of Columbia, by the same counsel appearing for the plaintiffs in this case in behalf of George Palmer, Adam Wright and Eugene Carter, who are designated as Negro locomotive firemen suing on behalf of themselves and all other Negro locomotive firemen employed on the Southern Railway, Seaboard Air Line Railway and the Atlantic Coast Line Railway. The carriers named were impleaded as defendants, along with the Brotherhood and certain lodges and individual officials of the Brotherhood. The object of the suit was to obtain an injunction restraining the defendants from negotiating concerning the proposals contained in the notice of January 26, 1948; from acting or purporting to act as representatives of the Negro firemen so long as they refuse to give notice of proposals affecting such firemen and to afford such firemen an opportunity to participate in the choice and control of the agents or officers of the Brotherhood, who handle collective bargaining; an opportunity to participate in determining the position of the Brotherhood, and a disclosure of all actions taken by it affecting the interests of the plaintiffs as members of the craft or class. Compensatory and punitive damages are also sought.

On April 13, 1948, the Court granted a preliminary injunction against the Brotherhood, which, however, does not preclude the parties from negotiating, although it restrains the Brotherhood from entering into a contract embodying the suggestions contained in the January 1948 proposal.

Of interest, also, is Graham et al. v. Brotherhood of Locomotive Firemen & Engineers, 338 U.S. 232, 70 S.Ct. 14, Id., 84 U.S.App.D.C. 67, 175 F.2d 802; Graham v. Southern Ry. Co., D.C.Cir., 74 F.Supp. 663.

My first impression was that the case at bar presents the same questions involved in the Tunstall case and that the decisions in that case and others, including the Steele case, are controlling. However, upon further consideration and after hearing the evidence and argument of counsel it appears that the Tunstall case is merely a corner of the full picture. It is perhaps also worthy of note that this case appears to be the first, of a series, in which the Court has heard the testimony of witnesses and considered the factual situation, except as disclosed by affidavits and exhibits.

The question, and the only question, presented is whether the Brotherhood is fairly representing the colored firemen, or, if the Brotherhood, in its capacity of bargaining representative, is using its power, as such, to discriminate unfairly against the colored firemen on account of their race or color. If the Brotherhood is fairly representing the colored firemen, the application for an injunction should be denied. If the Brotherhood is using its power as bargaining representative in a manner unfair to the colored firemen on account of their race or color, the injunction should be granted.

In undertaking to arrive at a proper answer to the question there are a number of factors to be considered and it is necessary to eliminate from the mind other factors which exist and tend to color this type of litigation.

During the hearing reference was made to language employed in speeches and in magazine and newspaper articles of the past. There has been read into the record unfortunate expressions from leaders of the Brotherhood made as far back as prior to 1900. Suspicions have been aroused by such expressions, some of which were doubtless attributable to the inapt use of words by men trained in the use of mechanical equipment rather than in the use of language, although it is highly probable that self-interest motivated some of the actors involved. The relevancy of this evidence will be discussed later and an effort made to properly evaluate it.

Upon consideration of the entire case, as disclosed by the evidence, it is obvious that each group has problems peculiar to itself. Each of the groups here involved occupies a position different from that of the other two.

The plaintiffs feel entitled to certain seniority rights which are based upon the bargaining contract negotiated at the instance of the Brotherhood. They are not members of the Brotherhood and it would appear only natural and proper that they should take advantage of any benefit accruing to them under that contract. At first flush it would appear that their demands are reasonable and proper. They involve rights acquired under the contract as the result of long years of service, and a denial of those rights appears in the nature of the discrimination prohibited by law. It would seem then to follow that the action of the Brotherhood in undertaking to negotiate a new agreement and deprive the plaintiffs of those rights is an unfair exercise of its power as bargaining agent and should be enjoined.

However, I do not find the question as simple as this. The right of one person stops when that of another begins and there are other rights involved in this case.

Next, turn to the situation of the defendant Brotherhood. I have been impressed by testimony concerning the necessity for the preparation of potential locomotive engineers. From the evidence which I have carefully followed and weighed, this is no specious contention on the part of that group. Experienced railroad men, including the colored firemen who have testified, agree that experience as a fireman is at

least desirable, if not necessary, in the training of an engineer. This is a matter of concern to all parties to this proceeding and of equal importance to the traveling public. Unless some plan is worked out by which this experience can be acquired, where are future engineers to be found? One answer which appears reasonable upon its face and which has been suggested, is the abolition of the distinction between promotable and non-promotable firemen, and the application of one rule concerning promotion. It was referred to by this Court in Tunstall v. Brotherhood, D.C., 69 F.Supp. 826, at page 829, and is the principal proposal in the notice of January 26, 1948, sent by the Brotherhood to the railroad. That solution is complicated by traditional customs and practices. It is prohibited by the injunction in the Palmer case and involved in the action taken in the Graham case. It is further complicated by the opposition to that arrangement on the part of the colored or non-promotable firemen. In addition to the injunction in the Palmer case and the action taken in the Graham case, both at the instance of the members of the craft or class occupying the same position as the plaintiffs and intervenors here, the uncontradicted testimony throughout the entire heading of both the white engineer and the colored fireman now employed by the railroad, is that the colored fireman does not want to be forced to take the examination for promotion. The Brotherhood, in contemplation of the modification of the contract suggested in the notice of November 2, 1949, sent a letter containing a ballot upon this question to each of the 261 colored firemen employed on the Coast Line. With that ballot was enclosed a self-addressed stamped envelope. Only 9 ballots were returned, all of which were cast against the proposal. Those colored firemen questioned on the point unanimously stated that they did not seek promotion to the position of engineer. Some of them qualified their answers by stating that they do not desire promotion under present conditions, expressing apprehension that as a result of resentment working conditions would not be pleasant. It might be remarked parenthetically that if their fears are well-founded the effi-

ciency of operation might be impaired to such an extent as to embarrass the railroads as well as the public, although I do not intend this as an expression of apprehension upon that point on the part of the Court but merely as a reasonable conclusion based upon the testimony. Numerous white engineers, including officers of local lodges, testified that from time to time they have talked with colored firemen serving under them, some of whom had sought their advice, and that not one had expressed a desire to be subjected to the responsibility incident to a promotable status; that is, the responsibility devolving upon the engineer. This is understandable when it is remembered that such status would necessitate the taking of an examination which might result in the dismissal of the fireman. Furthermore, those who successfully pass the examination would be forced from desirable job assignments as senior firemen to enter the rank of engineers as juniors and accept assignments, which, in some cases, are less desirable than those they now hold. Objections on those grounds are serious as applied to individuals now employed as non-promotable firemen. A large majority of these men have spent the greater portion of their lives in the service of the railroad. Many of them are advanced in age. No doubt such an arrangement would put some of them out of work and without qualification for other positions. However, one who exercises a right must be charged with the responsibility which accompanies that right and these considerations while real and of importance to the colored firemen, are not controlling in determining the answer to the question before the Court.

There are yet other considerations. The Brotherhood and the railroad are under an injunction from a court of competent jurisdiction, restraining them from entering into a contract which upon its face would grant equality to the colored fireman. Conceivably that injunction may not become permanent or some other acceptable method of negotiating a contract between the Brotherhood and the railroad to meet the objection may be devised, but I am aware of no law under which the railroad could be required to employ any particular person

or class of persons except under the terms of a bargaining contract mutually acceptable to the parties. Whether such negotiations will be successful is problematical. In its employment policies the railroad is confronted with a tradition, the result of which appears to be in the main in accord with the personal wishes of the colored firemen now in service. It is to be borne in mind that this litigation involves the colored firemen now employed by the Coast Line and the Brotherhood, and possible successors of such parties are not here concerned nor to be considered. The president of one of the organizations composed of colored employees promoting this litigation testified. Under cross-examination he was unable to point to any suggestion contained in the January 1948 notice which he found objectionable or which was not embodied in conditions laid down to the Brotherhood in correspondence from counsel for his organization and made a part of the record. Yet, the adoption of the proposals contained in that notice has been enjoined at the instance of colored firemen and presumably of the organization represented by this witness.

He did complain of the fact that he, or his organization, had not been consulted in advance concerning the proposal. In this connection it is to be remembered that under the provisions of the Railway Labor Act the Brotherhood is the sole bargaining representative of the entire craft or class. So far as the employees of the railroad as such are concerned, the other organization is non-existent, although it claims a membership of approximately 150 of the colored firemen. While it is desirable that those for whose benefit an agreement is being made should be consulted, it is in evidence here that the individual members of the Brotherhood are not consulted concerning the negotiation of contracts although it is true that by virtue of their membership they can exercise some control over the representatives who negotiate a contract. It is not denied that the colored firemen were given notice of the proposals as previously mentioned, although it does not appear that their advice was sought any more than was the advice of the individual members of the Brotherhood.

However desirable conferences with those individuals affected may be, it is not required under the Act and it is not the test here. The test is whether the Brotherhood has unfairly discriminated against these firemen on account of their race or color. There have been suggestions made by those representing the colored firemen that they should be accorded membership in the Brotherhood. So far as the Court is concerned, the answer to this is that under the law the Brotherhood determines the qualifications of its membership and it is a matter with which the Court is not concerned.

Thus we have three separate groups, with separate and distinct interests involved, one of which, the Brotherhood, is charged by law with the duty of exercising the responsibilities of a fiduciary toward one of the groups (the colored firemen). In the exercise of that duty the Brotherhood must act in good faith but at the same time it is bound by practical considerations involving the rights of the railroad and considerations of practical policy in promoting the best interest of the transportation system involved, including the rights of the traveling public. It is not a fiduciary for any person not now employed by the railroad company as a member of the craft or class.

In the exercise of its responsibilities it is attacked for its action in seeking the apportioning of job assignments in order that there may be an opportunity afforded for the training of future engineers. It is true that the apportionment results in benefiting certain white firemen who are either members of or eligible to membership in, the Brotherhood. This is unfortunate since it tends to cause suspicion and seemingly might justify a charge of bad faith but it is a condition which appears unavoidable. Having been enjoined in the Tunstall case specifically from carrying out such an arrangement, the Brotherhood turns to what appears the only alternate course, (at least no other practical alternative has been suggested), and undertakes to negotiate a contract completely eliminating all distinctions between promotable, or white firemen, and nonpromotable, colored firemen. Under that plan both groups would be accorded exactly the same treatment. Almost imme-

diately, at the instance of colored firemen, it is enjoined from entering into such an agreement. The railroad stands in the middle between the two groups but confronted with a tradition under which colored firemen are not promoted to the position of engineer. The colored firemen who have seen fit to appear and testify, indicate their unwillingness to be subjected to the hazards of an examination for engineer at the risk of dismissal and it is from them there comes the opinion that such a change would result in unsatisfactory working conditions even should they be promoted.

At this stage of reasoning the question which naturally arises is: What are the plaintiffs seeking? The apparent answer is that they seek the retention of their seniority rights under the so-called straight seniority rule to the exclusion of potential engineers. They are claiming equality of treatment upon the sole point of seniority. When offered full equality of treatment they decline to accept it if required to accept the responsibilities attendent to such a status.

It would seem that this situation is one which might be described by the language of the Supreme Court in the Steele case when it said: "This does not mean that the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented." [323 U.S. 192, 65 S.Ct. 232]

The Court then proceeded to give certain illustrations including "differences in seniority". As pointed out, seniority of employment does not exist except by contract. In the absence of contract none of these employees would have seniority rights. Having acquired such rights under the contract, those rights must be respected so far as practicable. However, theory must here give way to practical considerations. The Brotherhood is confronted with the necessity of protecting the rights of colored firemen including their seniority rights derived from the contract. It is also confronted with the practical necessity of devising a method to supply potential engineers with proper training. The colored firemen are unwilling to accept the responsibilities incident to a status of promotability. Stated somewhat differently, they demand the seniority rights granted by contract and argue that failure to accord them such rights on the same basis as the white firemen results in discrimination. When offered absolute equality with the white firemen they seek and obtain an injunction preventing the Brotherhood from entering into a contract to effect that object, contending that the Brotherhood is not acting in good faith. There is no evidence before the Court to sustain this contention other than the references to statements made years ago, which have been previously mentioned. It can not be presumed that those now directing the affairs of the Brotherhood are not in good faith endeavoring to comply with requirements laid down by the Courts. Upon the contrary, the presumption is that they are attempting to find a proper solution. This is strengthened by the fact that the proposal is in accord with decisions of the courts and demands made by colored firemen and on its face places members of the two groups upon a basis of equality in employment conditions.

■ An application for an injunction is governed by principles of equity. One of the first principles, of ancient origin, is that the seeker must himself do equity. This the colored firemen are unwilling to do. They insist upon full equality in reaping the benefits of seniority while resisting any effort to place upon their shoulders the responsibilities which accompany that right.

■ In view of the foregoing it is my opinion that the application for an injunction should be denied and the suit should be dismissed.

■ There remains the question of costs and counsel fees. It will be observed that this suit was filed at a time prior to final disposition of the Tunstall case and prior to the notice of January 1948. It was also filed prior to the injunctions in the Palmer and Graham cases. Both the named plaintiffs and counsel in the Graham case are different from the named plaintiffs and counsel in this case. The named plaintiffs

in the Palmer case are not the same as those in the instant case, although counsel who appeared in this case also appeared in the Palmer case. In view of the fact that the Brotherhood so far as the Court is informed had taken no action looking to equalization of the rights of the parties at the time this suit was instituted, it is my view that the costs of this proceeding incured prior to the institution of the Palmer case should be paid by the Brotherhood; and that counsel for the plaintiffs should be allowed a reasonable fee for the institution of the suit and its conduct to the date of the injunction in the Palmer case.

It is suggested that counsel for the defendants prepare and submit to counsel for the plaintiffs for endorsement draft of proposed order carrying into effect the views here expressed. Should counsel be unable to agree upon the terms of an order a time will be fixed for a hearing upon the subject.

This memorandum is intended to be in lieu of findings of fact and conclusions of law. If counsel desire additional or supplemental findings and conclusions upon any special point, consideration will be given appropriate application therefor.

### Supplemental opinion

From a conference with counsel it appears that the memorandum filed herein on February 23, 1950, contains some minor inaccuracies and that certain statements therein might be clarified. Accordingly this memorandum is filed as an amended and supplemental memorandum in lieu of additional findings of fact.

The agreement entered into during the 1920s, limiting the employment of colored firemen to 2/3 of the available jobs, was modified on the Atlantic Coast Line on November 2, 1929, so as to provide that 50% of the firing jobs would be assigned to white firemen. In the preparation of the original memorandum this date was not considered important since the conference agreement of 1941 is the contract under consideration. In this connection attention should be invited to the fact that under the 1941 agreement it is provided that the maximum job assignments of the colored

firemen shall be 50%, thus constituting a ceiling rather than an allocation of job assignments.

I do not intend to be understood as declaring that there is a legal duty upon the Brotherhood to supply potential engineers with proper training. As a practical matter and in the furtherance of a desirable employer and employee relationship, I feel that there is an obligation upon the part of the Brotherhood for the benefit of both the employer and the individuals whom the Brotherhood represents as bargaining agent.

The reference on page 6 of the memorandum [91 F.Supp. 587] to the notice by the Brotherhood of its desire to modify the bargaining contract so as to increase the ratio perhaps should be amplified. The statement there contained is not intended to be understood as meaning that the proposal in its original form was for the 50% ratio. That percentage was agreed upon as the result of negotiations and is the arrangement incorporated into the agreement. The original suggestion of the Brotherhood was less favorable to the colored firemen.