**Boyd PETERS et al., Plaintiffs-Appellees,**

v.

**MISSOURI–PACIFIC RAILROAD COM-PANY, Defendant-Third Party Plaintiff-Appellant,**

v.

**UNITED TRANSPORTATION UNION, Third Party Defendant.**

**No. 71-3566.**

United States Court of Appeals, Fifth Circuit.

April 10, 1973.

As Modified on Denial of Rehearing and Rehearing En Banc June 27, 1973.

Certiorari Denied Nov. 5, 1973. See 94 S.Ct. 356.

Tracy Crawford, Tyler, Tex., James P. Simpson, Dallas, Tex., for plaintiff-appellant.

Franklin Jones, Jr., Carl Roth, Marshall, Tex., for plaintiffs-appellees.

John de J. Pemberton, Jr., Acting Gen. Counsel, Margaret S. Rogers E.E. O.C., Washington, D. C., for amicus curiae.

William S. Reeves, Tyler, Tex., for other interested parties.

Before WISDOM, THORNBERRY and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This case presents the question of whether the defendant Missouri-Pacific Railroad violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. A. § 2000e–2(a) (1970),[1] by entering in-

1. "It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
   (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual

to and enforcing a collective bargaining agreement providing for retirement at age 65 for firemen on its DeQuincy Division, all of whom were black. The agreement was made with International Association of Railway Employees (IARE), the union representing the firemen on the DeQuincy Division. The entire membership of IARE Local Lodge 3 was composed of the DeQuincy Division firemen. When the agreement in question was made substantially all firemen on the Railroad's other divisions were white. The white firemen were represented by unions other than IARE[2] and, except for the firemen on one division, were subject to separate collective bargaining contracts setting compulsory retirement at age 70.[3] The retirement provision for black firemen was signed June 26, 1964, prior to passage of the Civil Rights Act of 1964, but by agreement did not become effective until December 31, 1966, subsequent to the Act's effective date, July 2, 1965.

Plaintiffs are six black members of Local 3 formerly employed as firemen by the Missouri-Pacific on the DeQuincy Division. Pursuant to the 1964 agreement, and because they were over 65, five of them were retired on January 4,

1967 and the sixth on October 5, 1968. Upon retirement they began receiving pensions smaller than their wages would have been had they continued working. The plaintiffs sued under 42 U.S.C.A. § 2000e–5(e) and (f) (1970) alleging that the Railroad had discriminated against them by forcing their retirement solely because of their race, in violation of 42 U.S.C.A. § 2000e–2(a). The Railroad answered and brought a third party complaint against BLF&E, the then bargaining representative of the DeQuincy firemen, and four local union officials who were sued as representatives of the "class of persons holding seniority as Locomotive Firemen" on the DeQuincy Division. The court granted the Railroad's motion to maintain the third party action against this class, and notice was given to the Railroad's employees constituting the class.[3A]

Sitting without a jury, the District Court found that the earlier retirement age for the black firemen violated 42 U.S.C.A. § 2000e–2(a) (1970) because their white counterparts, under separate agreements, were permitted to continue working to age 70. The court awarded all plaintiffs back wages for the time they could have worked[4] but for the age

of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

2. The white firemen were organized into many bargaining units and were represented by either the Brotherhood of Locomotive Firemen & Enginemen (BLF & E) or the Brotherhood of Locomotive Engineers (BLE), both of which maintained whites-only membership policies before the passage of the Civil Rights Act of 1964.

3. We entertain no doubt that Congress intended Title VII to reach retirement plans as conditions of employment, just as such plans are viewed as employment conditions under the National Labor Relations Act. See Bartmess v. Drewrys U.S.A., Inc., 444 F.2d 1186, 1188–1189 (7th Cir. 1971), cert. denied, 404 U.S. 939, 92 S.Ct. 274, 30 L.Ed.2d 252 (1971).

Retirement plans establishing different ages for retirement of male and female employees of one employer violate Title

VII. Rosen v. Public Service Electric and Gas Co., 328 F.Supp. 454 (D.N.J.), aff'd on rehearing, 328 F.Supp. 454 (1970), and Bartmess v. Drewrys U.S.A., Inc., supra.

3A. The third party action, in which a class composed of the then employed DeQuincy Division firemen were named as defendants, was protective in nature. The Railroad sought no money damages. Rather it asked, in the event judgment was granted for plaintiffs and reinstatement ordered, that it be protected against retribution from the union and the class of firemen represented whose bargained seniority rights might be affected by the Railroad's efforts to comply. The final judgment granted such relief. The third party defendants have not appealed from that judgment.

4. The court received evidence and made findings on the periods of time respective plaintiffs would have been physically unable to work even if they had not been mandatorily retired at age 65.

65 retirement agreement, ordered reinstatement for two plaintiffs not then age 70, and awarded attorney fees to plaintiffs' counsel. The Railroad appeals. We affirm.

## I. The history.

The record fully supports the findings of the District Court that prior to 1964 the Railroad classified, separated and segregated its employees on the basis of race, and that this resulted in the racial composition of Local 3 of IARE.[5] Black and white firemen worked in different geographical areas and, as we have pointed out, were represented by different unions.[6] Black firemen received inferior rates of pay and fringe benefits and worked longer hours than their white counterparts. The Railroad employed only blacks to work as firemen on the DeQuincy Division and only whites as firemen elsewhere.

In 1956, shortly after Missouri-Pacific took over the small lines and their black firemen, the Railroad received a request from H. W. Simpson, Chairman of IARE Local 3, asking that firemen on the DeQuincy Division be mandatorily retired at age 70. Prior to that time there had been no mandatory retirement age for any of the Railroad's firemen. According to oral testimony given at trial, Simpson had been elected as the candidate of younger firemen, displacing a chairman who favored the older men. The written request made by Simpson to the Railroad included these stated reasons:

[S]uch an agreement would be an asset to the Carriers economically, and would increase the efficiency and safety in the performance of duties. It would give some of the twenty-five furloughed firemen a chance to work. There are some men with more than twelve years of service who have not worked in years. Young men with families have no hope of entering the service unless some form of compulsory retirement is agreed upon. We have firemen who are over seventy years of age hardly physically fit to remain in the service.

President Whitaker of IARE testified that Chairman Simpson had reasoned that, although older firemen would be put out of work by mandatory retirement, they would still draw pensions, whereas the younger nonworking firemen, who had exhausted their unemployment benefits, were presently without means of support. The Railroad agreed to Local 3's 1956 request.

White firemen first became subject to compulsory retirement in 1959, when an agreement was negotiated with unions representing some of them providing for retirement at 70. In 1963 most of the remaining whites became subject to mandatory retirement at 70.

In 1958 IARE, by letter, suggested to the Railroad that the mandatory retirement age for the blacks be reduced to 65. But in 1959 most of the railroads in the country served notice on most of the railroad unions under Section 6 of the Railway Labor Act [7] that they wanted to

5. The black firemen became employees of Missouri-Pacific in 1956 when by merger it acquired their former employers, three small railroads, which became part of defendant's DeQuincy Division. IARE had been their collective bargaining agent for many years prior to the mergers, and it represented employees of other railroads as well.

6. IARE was created in 1934 to represent blacks employed by the railroad industry because blacks were not admitted to membership in the "Big Five" all-white railroad unions. According to testimony of its President Whitaker, IARE, prior to the passage of the Civil Rights Act of

1964, resisted efforts of BLF & E, one of the "Big Five," to take over bargaining for the black firemen of the DeQuincy Division because it feared the whites-only union would not fairly represent the blacks' interests. In 1968, after the events involved in this appeal and after IARE had begun voluntary dissolution because rights of full membership and fair representation were being granted blacks by the "Big Five" unions, the BLF & E became the certified representative of the black firemen of the DeQuincy Division.

7. 45 U.S.C.A. 151 et seq. (1972).

change collective bargaining agreements so as to, in effect, eliminate all firemen on diesel locomotives. The IARE's age 65 request lay dormant while most of the nation's railroads and railroad unions fought over the status of firemen. This national dispute was finally settled in 1963 by Award 282 of a board of arbitration established by Congress. See Pub.L. No. 88–108, § 2, 77 Stat. 132 (Aug. 28, 1963). Award 282 allowed the participating railroads (1) to terminate firemen with less than two years seniority; (2) to terminate firemen with more than two years seniority whose average monthly earnings for the last two years had not exceeded $200; (3) to terminate firemen with more than two years seniority who had not worked in two years; and (4) to "blank", i. e., leave open and unfilled, the jobs of firemen who retired after the effective date of the Award. Firemen who had 10 years seniority and whose average monthly earnings were in excess of $200 were protected by the Award.

The national dispute and Award 282 substantially altered the employment context of the Railroad's firemen by protecting the employment status and opportunities of some but destroying the status and opportunities of others. The Award would materially reduce the labor requirements of the Railroad on its De-Quincy Division, but only after it succeeded in having the terms of Award 282 included in the collective bargaining agreement it had with IARE as representative of the black firemen on that Division.[7A] Thus, in May 1964, the Railroad proposed to IARE, as subjects of

collective bargaining, the adaptation and application of the provisions of Award 282 to the black firemen of its DeQuincy Division and the reduction of the mandatory retirement age of the black firemen from 70 to 65. Discussion of these two subjects [8] took place in separate meetings of the Railroad with President Whitaker of IARE and with Chairman Simpson and Committeeman Stewart of Local 3.

Pursuant to an understanding reached at these meetings, the Railroad prepared two written agreements, one applying the terms of Award 282 to the black firemen and the other providing for their mandatory retirement at age 65, and sent them for execution to IARE, the certified bargaining representative. President Whitaker signed both on June 19, 1964, and, according to IARE's intraunion agreement with Local 3, sent them to Chairman Simpson. Simpson and Local Committeeman Miller added their signatures on June 22, 1964, and returned the agreements by mail to the Railroad, which received them June 25, 1964.[9] The Railroad's director of labor relations executed the agreements for the Railroad on June 26, and inserted that date in the blank spaces provided for execution dates. By its terms the agreement regarding Award 282 became effective retroactively on June 1, 1964, but the effective date of the age 65 agreement was delayed by its terms until December 31, 1966.

Award 282 affected equally the Railroad's black and white firemen who fell into these groups: those with less than

---

**7A.** IARE as representative of the black firemen was not a party to the arbitration proceedings that culminated in Award 282. Hence the Railroad had no authority under 282 to unilaterally impose its terms upon the black firemen, and such action would have violated the existing collective bargaining agreement covering these men. IARE and the Railroad had agreed, however, that upon termination of the national dispute and entry of the national board's award, they would enter into negotiations and, using the national award as a pattern, construct an agreement applicable to the black firemen.

**8.** Other conditions of employment, including the disparity between the pay scales and fringe benefits of white and black firemen, were discussed as well.

**9.** In the same mail, the Railroad also received a letter from plaintiff Placide, dated June 23, 1964, stating that Charles Stewart "has been appointed General Chairman of Firemen, represented by the International Association of Railway Employees, succeeding Mr. H. W. Simpson," and asking that any correspondence be sent to Stewart. The letter did not mention the two agreements. See n. 26 at p. 499 *infra*.

two years seniority, those who had earned less than $4800 for the last two years, and those who had not worked at all in two years. Nevertheless, the interaction of 282 with the age 65 retirement agreement, once the latter became effective, placed an additional burden upon the black firemen. When the older black firemen were forced to retire, their jobs were "blanked" and no new blacks hired to replace them.[10] This reduction in firemen's jobs held by blacks was accomplished without a corresponding elimination of firemen's jobs held by whites since white firemen, generally, were not forced to retire until age 70. Although blacks were being required to retire at age 65 on pensions, the court found that the black retirees were no less competent for firemen's jobs than their white counterparts.

The mandatory retirement age for black firemen continued to be 65 until June 1969, after this suit was filed. At that time the Railroad and BLF&E, which by then had become bargaining representative for the black firemen as well as for some white firemen, agreed to raise the age to 70, the mandatory age for substantially all the Railroad's white firemen.

## II.

The District Court found that the Railroad had "discriminated against" the black firemen of its DeQuincy Division "because of their race" prior to the effective date of the Act (July 2, 1965) and that the age 65 retirement agreement, and the differential treatment it imposed on the black firemen by requiring that they retire five years earlier than white firemen, were "the result of the [Railroad's pre-Act] discriminatory hiring policies." The trial judge concluded that the retirement agreement (which was negotiated and executed pre-Act but became effective and was enforced against these plaintiffs post-Act) "adversely affected" plaintiffs' status as employees and "discriminated against" them on the basis of their race. The court further concluded that the retirement agreement "carried forward into the present and the future effects of prior racially discriminatory employment practices of defendant." The court held that the actions of the Railroad in entering into and enforcing the retirement agreement constituted an unlawful employment practice in violation of 42 U.S.C.A. § 2000e–2(a), and it granted judgment for plaintiffs.

The parties urge differing legal consequences to be drawn from the pre-Act history of the Railroad's relationship with the black firemen of the DeQuincy Division. The plaintiffs seek to employ this history, and its nexus to the generic tradition of discrimination against blacks by the railroad industry,[11] as a sword entitling them by its sole force to a judgment against this employer. The Railroad seeks to employ the same history, considered in the context of the requirements of the Railway Labor Act, as a shield insulating it from Title VII liability. In our view neither position is correct and neither reflects the careful analysis embodied in the determinations of the District Court.

The plaintiffs' theory is essentially an argument that a showing of historical pre-Act racial discrimination alone establishes a per se violation of

---

10. The parties stipulated that the effect of the age 65 agreement was to reduce the number of black firemen employed by the Railroad.

11. A tradition well recorded in federal jurisprudence. See, e. g., Steele v. Louisville & Nashville R. Co., B.L.F. & E., etc., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Tunstall v. Brotherhood L.F. & E., 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed.

187 (1944); Brotherhood of Locomotive F. & E. v. Palmer, 85 U.S.App.D.C. 429, 178 F.2d 722 (1949); Mitchell v. Gulf, Mobile & Ohio R. Co., 91 F.Supp. 175 (N. D.Ala.1950), modified and aff'd sub nom., B. of Locomotive F. & E. v. Mitchell, 190 F.2d 308 (5th Cir. 1951); Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473 (4th Cir. 1951), and Norman v. Missouri-Pacific R. Co., 414 F.2d 73 (8th Cir. 1969).

Title VII. We rejected that theory in United States v. Jacksonville Terminal Co., 451 F.2d 418, 450 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). See also L. Sutter, Current Procedural and Evidentiary Consideration Under Title VII of the Civil Rights Act of 1964: Ready for the Defense, 6 Ga.L.Rev. 505, 516 (1972). In applying Title VII courts have not ended their factual examinations and legal analyses at the point where they find historical evidence of pre-Act, racially discriminatory treatment by the employer. Rather, recognizing that Title VII operates only prospectively, the courts have consistently gone further to scrutinize the etiology, as revealed by the evidence, of the present terms and conditions of employment alleged to violate Title VII. And where they have found a causal nexus between the past discrimination and the challenged present condition of employment, not justified by some "business necessity" which itself complies with Title VII, the courts have held that the present condition violates Title VII. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Local 189, United Papermakers, etc. v. United States, 416 F.2d 980 (5th Cir.), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); United States v. Jacksonville Terminal Co., *supra*, and Rowe v. General Motors Corp., 457 F.2d 358 (5th Cir. 1972). Relief has then been granted even in the absence of a showing of present intent to discriminate[12] and even in the presence of a showing of present good intent towards alleged discriminatees.[13]

The Railroad's theory, on the other hand, is that it is shielded from Title VII liability for this retirement agreement because the objectionable provisions were acceded to by it at the request of IARE. The underpinnings for its theory are these: (1) It is required by the Railway Labor Act (RLA) to bargain with the certified representative of its black firemen on proposals concerning conditions of employment.[14] (2) The firemen's bargaining representative has the statutory duty fairly to represent the black firemen for whom it bargains without discrimination because of their race.[15] (3) The challenged age 65 retirement agreement is itself a product of collective bargaining, having been first proposed for bargaining by the plaintiffs' bargaining representative (IARE) and finally agreed to by IARE and the officers of plaintiffs' local. (4) The plaintiffs do not contend that the agreement and the actions of their representative and officers in proposing and assenting to it violated the requisites of the RLA's duty of fair representation.

This theory too must be rejected. The age 65 agreement quite reasonably can be viewed as the product, in part, of intra union political resolution of competing economic interests of the older and younger black firemen in a declining job market and as the fruition of their bargaining representative's good faith representation of the economic interests of the politically victorious younger firemen.[16] But if the conditions which created the intraunion economic warfare underlying the age 65

12. See Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158, 165 (1971).

13. See Rowe v. General Motors Corp., 452 F.2d 348, 355 (5th Cir. 1972), and Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158, 165 (1971).

14. 45 U.S.C.A. § 152 (1972).

15. See Steele v. Louisville and Nashville R. Co., etc., 323 U.S. 192, 202–203, 65 S.Ct. 226, 232, 89 L.Ed. 173, 183 (1944);

Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Tunstall v. Brotherhood of L.F. & E., 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944), and Brotherhood of R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952).

16. Steele v. Louisville & Nashville R. Co., Brotherhood of L. F. & E., etc., 323 U.S. 192, 203, 65 S.Ct. 226, 232, 89 L.Ed. 173, 183 (1944):

"[The RLA's imposition of a duty of fair representation] does not mean that

agreement and which made necessary the intraunion choice between the competing economic interests of its members were themselves, in substantial part, effects of past racial discrimination by the employer, then the agreement violates Title VII as a present effect of prior employer racial discrimination. It is not shielded by the facts that it is the product of collective bargaining and meets the standards of fair representation imposed by the RLA and *Steele*.

In Taylor v. Armco Steel Corp. et al., 429 F.2d 498 (5th Cir. 1970), we were confronted with the dismissal of a complaint brought by black employees alleging that a collectively bargained seniority system being presently enforced by their union and their employer violated Title VII. We reversed and remanded. Eleven years earlier in Whitfield et al. v. United Steelworkers of America et al., 263 F.2d 546, cert. denied, 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959), we had given our blessings to the installation of this system at the Houston plant of Armco, resting our approval of the collectively bargained employment condition on the National Labor Relations Act [17] and *Steele*. Attaching "particular importance to the good faith of the parties in working toward a fair solution," [18] we found that while the sen-

iority agreement fell short of cleansing progression lines of past racial discrimination, "they have a contract that *from now on* is free from any discrimination based on race." [19] Yet in *Armco, supra,* Judge Wisdom, the spokesman for the court in *Whitfield,* recognized that while our *Whitfield* decision and the seniority agreement were "defensible" within the context of the NLRA and *Steele,* the seniority agreement still had to be tested under the requirements of Title VII and of the cases finding Title VII violations in the post-Act continuation of the effects of pre-Act racial discrimination by employers.[20]

The point which we made in *Armco,* and the grounds upon which we reject the Railroad's argument here, are not new to Missouri-Pacific. In Norman v. Missouri-Pacific R., 414 F.2d 73 (8th Cir. 1969), one of the cases we relied upon in *Armco,* the Eighth Circuit held that a prior determination under the RLA upholding the terms and conditions of employment then being challenged under Title VII by black employees, did not prevent the employees' complaint from stating a cause of action under Title VII against Missouri-Pacific. *See also* Tipler v. E. I. DuPont deNemours & Co., 443 F.2d 125 (6th Cir. 1971); Hutchings v. United States, 428 F.2d 303 (5th

the statutory representative of a craft is barred from making contracts which may have unfavorable effects on some of the members of the craft represented. Variations in the forms of the contract based on differences relevant to the authorized purposes of the contract in conditions to which they are to be applied . . . are within the scope of the bargaining representation of a craft, all of whose members are not identical in their interest or merit."
Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048, 1058 (1953) :
"Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A

wide, range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion."

17. The NLRA has been construed to impose a statutory duty of fair representation equivalent to that which Steele v. Louisville & Nashville R. Co., Brotherhood of L. F. & E., etc., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), held to be imposed by the RLA. See Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842, 850 (1967).

18. 263 F.2d at 551.

19. *Id.* (emphasis in original).

20. See, *e. g.,* Local 189, United Papermakers, etc., v. United States, 446 F.2d 980 (5th Cir. 1969).

Cir. 1970); Robinson v. Lorillard Corp., 444 F.2d 791 (4 Cir. 1971), and Glus v. G. C. Murphy Corp., 329 F.Supp. 563 (W.D.Penn.1971).

■■ Even if the Railroad's intent in agreeing to and enforcing the challenged employment agreement was a racially neutral, or even benevolent, desire to discharge its legal duty to bargain with the plaintiffs' representative and to enforce the contract entered into, such intent does not save the agreement from the terms of Title VII if it operates to "freeze" the status quo of prior discriminatory employment practices. In *Griggs, supra*,[21] the Supreme Court reshaped the statutory concept of discrimination in terms of consequence rather than motive, effect rather than purpose, to make clear that Title VII requires more of an employer who has discriminated in the past than present and future equal treatment of similarly situated employees regardless of their race. Under the mandate of Title VII, such an employer must scrutinize even the steps he now takes with neutral or benevolent motives [22] to determine if they operate as "built-in headwinds" [23] for minority groups and are unrelated to job performance. If they have that operative effect, they contravene Title VII.

We conclude, therefore, that the District Court correctly predicated judgment for plaintiffs on the legal theory that Title VII was violated if the age 65 agreement and its enforcement, irrespective of their collectively bargained origin, were shown to be the continued, present adverse effects of the Railroad's pre-Act, racially discriminatory employment practices.

### III.

■ The District Court did not plainly err in finding that the Railroad had in fact discriminated in the past and that the age 65 agreement adversely affected plaintiffs and was the present effect of the employer's past discrimination. We emphasize the interplay of several factors supporting the court's determinations.

Notwithstanding what the motives of IARE or Local 3 had been in initially proposing the age 65 plan for bargaining in 1958, the testimony of President Whitaker evidences that retirement at 65 was proposed and agreed to in 1964 in order to induce the Railroad to eliminate the long-standing differentials in pay and benefits which still existed between white and black firemen.[24] Whitaker explained further why it was necessary in 1964 to use collective bargaining about age 65 retirement, rather than some other form of concerted action imposing less of a detriment to older IARE members, as a quid pro quo for the achievement of equality. The white employees of the Railroad and their white-dominated unions had consistently

21. The District Court in the present case made its findings and conclusions of law and granted judgment for plaintiffs prior to the Supreme Court decision in *Griggs*, whose importance to the legal definition of employer discrimination violative of Title VII and the correctness of the judgment below is recognized by the parties. While the District Court's determinations might be phrased differently from the ones it could make now using *Griggs*, our concern here is whether plaintiffs have proven that which must be shown to establish their right to relief and whether defendant has shown anything which constitutes a defense under the present construction of Title VII exhibited by *Griggs*. We recognize, for example, that the Railroad's collective bar-

gaining argument discussed above might be rephrased after *Griggs* as an attempt to establish a "business necessity" defense for the different retirement ages of black and white firemen. What we have said here, however, disposes of that attempt, whatever its verbal formulation. A "business necessity" which is itself the product of the continuation of prior employer discrimination violates Title VII.

22. See Rowe v. General Motors, 457 F.2d 348, 355 (5th Cir. 1972).

23. Griggs v. Duke Power, 401 U.S. at 432, 91 S.Ct. 849, 28 L.Ed.2d at 165.

24. The record fully supports, and the District Court found, that these differentials had been imposed on the black firemen because of their race.

refused to support IARE threats to strike for equality in treatment. Since the black firemen had been geographically segregated by the Railroad, they belong to different bargaining units than the white firemen. Hence, the unions representing white firemen were not forced by the RLA and the *Steele* doctrine to fairly represent and support equally the interests of the blacks.

But Award 282, Whitaker testified, gave the black firemen and IARE the first intrinsic bargaining strength they ever enjoyed. Award 282's terms would not become effective on the DeQuincy Division until its provisions had been adopted and included in the collective bargaining agreement existing between the Railroad and IARE. Moreover, the Railroad would be able to materially reduce its labor requirements on the DeQuincy Division under Award 282 only through the retirement route, substantially all the black firemen there having more than 10 years in service and average monthly wages in excess of $200.[25] The Railroad, then, needed the adoption of 282 and the earlier retirement of plaintiffs to achieve the relief from featherbedding potentially permitted under the Award. Retirement at age 65 and the "blanking" of jobs held by black firemen forced to retire at 65 became the price which the black firemen, younger and older, had to pay and the only "tender" they possessed (given their lack of other kinds of traditional bargaining strength) which they could offer in exchange for the equal pay and benefits that but for the past racial discrimination they would have already enjoyed. No such surrender was necessary for white firemen who, generally, were permitted to work to age 70.[25A] As the stipulated facts disclose, once the black firemen were represented by the same union representing white firemen and enjoyed the bargaining power which derived from the duty of fair representation imposed by the RLA on their new representative, the Railroad agreed to eliminate the age 65 agreement and to treat black firemen equally in terms of retirement age.[26]

---

25. Jobs of such firemen were protected under the Award.

25A. The Railroad contends that black and white firemen are not fairly comparable classes. Its reasoning, while not entirely clear, appears to run this way. Most of the white firemen became engineers and left firemen ranks before reaching age 65 because they had accepted a rule making them eligible for promotion to engineer if they passed engineer tests. The black firemen on the DeQuincy Division, however, had declined to accept an equivalent promotion rule and thus continued in service as firemen until death or retirement. For purposes of discussion we accept these premises as correct, although the second is disputed. [For the history of varying treatment of black and white firemen concerning promotability, *see* Graham v. B.L.F.&E., 338 U.S. 232, 233, 70 S.Ct. 14, 94 L.Ed. 22, 26 (1949); Steele v. Louisville & Nashville R. Co., B.L.F. &E., etc., 323 U.S. 192, 195, 65 S.Ct. 226, 89 L.Ed. 173, 179 (1944); Mitchell v. Gulf, Mobile Ohio R. Co., 91 F.Supp. 175 (N.D.Ala.1950), modified and aff'd, 190 F.2d 308 (5th Cir. 1951), and Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473 (4th Cir. 1951), rev'g, 91 F.Supp. 585 (E.D.Va.1950).] However, testimony of the Railroad's labor relations officer, Claude Courtway, revealed that there were "a number" of white firemen not promotable to engineer who, nevertheless, were eligible to remain in defendant's *employ as firemen until mandatorily* retired at age 70. The black firemen were entitled to be treated, with regard to compulsory retirement age, equally as well as these similarly situated white firemen. Also, the failure of blacks to avail themselves of an opportunity to move out of their class would not confer upon the Railroad immunity from the consequences of discriminatory action against those choosing to remain in the class.

26. Because of our conclusion of law in Part II that the employer may be liable under Title VII even if the union has fairly represented the interests of the plaintiffs in terms of the RLA and *Steele* doctrine, we need not reach the issue of whether, prior to the Railroad's execution of the retirement agreement and with the Railroad's knowledge, a majority of the members of Local 3 were opposed to age 65 retirement.

## IV. Damages and attorney fees.

The Railroad claims that the back pay damages awarded plaintiff Placide duplicate in part damages previously awarded him for loss of wages in an earlier suit against the Railroad for personal injuries suffered on the job. The burden was upon the Railroad to establish its plea of estoppel by the prior state judgment. We are not able to say that the District Court erred in finding there was no double recovery.

There is no merit to the Railroad's claim that attorney fees awarded to plaintiffs' counsel were excessive.

The judgment of the District Court is affirmed.