**ROLAX et al. v. ATLANTIC COAST LINE R. CO. et al.**

No. 6167.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 21, 1950.

Decided Jan. 3, 1951.

As Corrected on Denial of Rehearing Feb. 23, 1951.

Joseph C. Waddy, Washington, D. C., and Oliver W. Hill, Richmond, Va., for appellants and cross-appellees.

Ralph M. Hoyt, Milwaukee, Wis., and Wm. G. Maupin, Norfolk, Va. (Harold C. Heiss and Russell B. Day, Cleveland, Ohio, on brief), for Brotherhood of Locomotive Firemen and Enginemen, appellee and cross-appellant.

Collins Denny, Jr., Richmond, Va. (J. M. Townsend, Petersburg, Va., on brief), for Atlantic Coast Line R. Co., appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

These are cross appeals in a suit instituted in the court below by Negro locomotive firemen employed by the Atlantic

Coast Line Railroad Company against that company and the Brotherhood of Locomotive Firemen and Enginemen. The purpose of the suit was to have the court declare void the agreement of February 18, 1941, which was condemned by this court in Brotherhood of Locomotive Firemen and Enginemen v. Tunstall, 4 Cir., 163 F. 2d 289, 291, to enjoin the defendants from carrying out the terms of that agreement in violation of the seniority rights of plaintiffs and to recover damages on account of violations of seniority rights which had already occurred. The District Judge dismissed the suit on the ground that plaintiffs had shown themselves unwilling to do equity in that they had joined with others in obtaining an interlocutory injunction in a suit pending in the District of Columbia restraining the defendants from negotiating an agreement which would apply the principle of forced promotion or discharge to all Negro firemen working for the defendant railroad. See 91 F.Supp. 585. He taxed in favor of plaintiffs and against the Brotherhood costs, including attorney's fees, incurred by plaintiffs in prosecuting the suit up to the time of obtaining the restraining order. Plaintiffs appeal from the dismissal of the suit, the Brotherhood from the portion of the order taxing costs against it.

In so far as the validity of the agreement of February 18, 1941, is concerned, the case is governed by our decision in the Tunstall case. The fact that this case was heard on oral evidence, whereas the Tunstall case was heard by affidavit on motion for summary judgment furnishes no valid ground of distinction; for the facts were fully explored in the Tunstall case and the questions raised as to the validity of the agreement and the discrimination practiced against the Negro firemen are the same notwithstanding that bargaining between the Brotherhood and different railroads is involved. The facts out of which the controversy arises are, except as to one or two minor matters, precisely the same as those which were before us in the Tunstall case and were stated there as follows:

"The Brotherhood represents all locomotive firemen employed by the defendant railway company for purposes of collective bargaining under the Railway Labor Act, having been selected as bargaining agent by a majority of the craft. Negro firemen, who constitute a minority of the craft, are not admitted to membership in the Brotherhood, but, nevertheless they must accept it as their bargaining representative, since it is the choice of the majority. Matters of great importance to locomotive firemen in the realm of collective bargaining are seniority rights and the right to promotion to the more highly paid position of locomotive engineer. Upon seniority depends the right to the more desirable runs and upon the right to promotion depends the possibility of advancing to the position of engineer. No railway company of the United States has ever employed a Negro as a locomotive engineer and the Negro firemen are recognized as nonpromotable to that position. Other firemen, if they possess the requisite mental and physical qualifications, are given opportunity to stand examinations for promotion to engineer, but not Negro firemen; and, because they are not promoted, Negroes serve for long periods as firemen and the seniority thus acquired enables them to obtain some of the best paid and most desirable runs in the company's service.

"The Brotherhood, as bargaining agent for all locomotive firemen in the Southeast, obtained from defendant railway and other Southeastern carriers, over their protest, contracts which had the effect of denying to a large number of Negro firemen desirable runs to which they were entitled by seniority and of giving these runs to white firemen. The Brotherhood accomplished this by contracts distinguishing between promotable and nonpromotable firemen. On March 28, 1940, it made a demand on the defendant railway company and other Southeastern carriers to modify existing working agreements so that only 'promotable' men would be employed as firemen. The carriers refused to agree to this, saying:

" 'As we understand this proposal, it is that the carriers parties to the conference obligate themselves that they will in future hire no nonpromotable men. The effect of this would be to exclude from employment in our service perhaps a small number of white persons who, because of educational qualifications or physical handicaps, might not be promotable, and, in addition, would exclude from employment all colored persons, because, upon the properties represented by this committee, colored employees are not promotable to position of engineer. In our conference we endeavored to point out to you that we doubted the wisdom and fairness of making any such agreement as this, first because it would restrict the field from which we might draw employees in the event of a labor shortage, and, second, because we did not feel that such a large proportion of the population of the territory which we serve should be completely banned from employment as firemen upon our properties. As we said to you, these people are citizens of the country; it is necessary that they make a living; colored people are patrons of the railroads, and, in our opinion, we should not by agreement entirely exclude them from employment in positions which they have occupied and filled over the years.'

"Notwithstanding this protest of the railroads, the Brotherhood insisted upon its position, contending that it was in the interest of efficiency in the operation of the railroads that experience as fireman be acquired by men who could be advanced to the more responsible position of engineer, and that it was not fair to recently promoted engineers, to require that when they had to serve as firemen, as they frequently did, they take the less desirable runs. The Brotherhood finally succeeded, on February 18, 1941, in obtaining a modification of existing agreements to provide that the proportion of non-promotable firemen should not exceed fifty per cent in each class of service established as such on each individual carrier and that, until such percentage was reached on any seniority district, only promotable men should be hired and all new runs and vacancies should be filled by promotable men."

Not only does the record in the case before us fully sustain the foregoing statement, but it makes clear that the agreement of February 18, 1941, was obtained in the course of a campaign which had been conducted by the Brotherhood for a number of years to eliminate Negro firemen from the service of the railroads. Prior to 1919, when the first collective agreement was negotiated by the Brotherhood, at least 85% of the locomotive firemen on the defendant railroad were Negroes. Although there had been agitation by the Brotherhood prior to that time for the elimination of Negroes from the service, the agitation seems to have become more effective when the Brotherhood was recognized as bargaining agent, and in 1927 it secured an agreement that one-third of the firemen should be promotable or white firemen. Two years later, in 1929, this proportion was raised by agreement to 50%. Later, following a campaign openly designed to get rid eventually of all the Negro firemen, the agreement here complained of was negotiated; and today only 35% of the firemen in the service of defendant railroad are Negroes.

The Brotherhood attempts to distinguish the case before us from the Tunstall case in that we do not have here the agreement of May 23, 1941, in which it was agreed with the Norfolk Southern Railroad that "non-promotable" firemen as used in the agreement of February 18, 1941, should refer only to Negro firemen and that seniority of others should not be affected by failure to pass promotion examinations. There was no occasion for such an additional agreement with the Atlantic Coast Line Railroad, however; for the evidence shows that, on that railroad, the only non-promotable firemen were Negro firemen and that the term "non-promotable firemen" was understood to refer to them, and to them alone. Furthermore, there is evidence of intent on the part of the Brotherhood to practice racial discrimination here with respect to the service of firemen that was not pre-

sent in the Tunstall case. It appears that in the war year 1942, the Coast Line, being in need of additional firemen, arranged to take on a number of students, forty or fifty of whom were Negroes. The Brotherhood immediately demanded that these Negroes be discharged and took a vote authorizing a strike if this were not done. The matter was compromised at the urgent request of governmental authorities who were anxious to avoid a strike which would have hindered the war effort; and, as a result of the compromise, only fourteen of the student firemen, those who had already been given employment status, were retained. The others, who had not acquired an employment status at the time but merely that of students, were discharged because of the Brotherhood's protest. The strike threat was held over the company, however, for five years, or until 1948.

■ The same argument was made in the Tunstall case that is made here as to the importance of having firemen who are promotable to engineers; and the same answer applies here as there, viz., that a bargaining agent for all the firemen may not bargain for them in such way as to discriminate in favor of its own members against a racial minority whom it excludes from membership. It is idle to attempt to justify such discrimination on grounds of operating efficiency. Such efficiency is primarily the concern of the railroad, which had not thought it necessary to limit the seniority rights of Negro firemen until pressed to do so by bargaining on the part of the Brotherhood, whose main concern is the interest of its members. Mr. C. G. Sibley, an experienced officer of the railroad, testifies that the percentage rule is not necessary to efficiency; and the railroad seems to have been operated efficiently when the proportion of non-promotable firemen was much higher than it is now. Undue emphasis has been placed upon difficulty experienced by the railroad in obtaining a sufficient number of engineers at the time of the Florida boom; but the Florida boom was a temporary condition and is nearly a quarter of a century behind us. Instead of a scarcity

of engineers, there is now such an over supply that, according to the testimony, many qualified engineers are serving as firemen.

■ It is proper, of course, for the defendant railroad to adopt such rules regarding the service of firemen as are necessary to provide experience for the training of engineers and to enter into agreements with the Brotherhood representing the firemen with regard thereto; but there is no reason why this may not be done without substantial interference with seniority rights, and the Brotherhood may not make the need for proper rules of this sort a pretext for eliminating the Negro minority from the service of the railroad or securing for its own members desirable runs to which the Negro firemen are entitled under prevailing seniority rules. As we said in the Tunstall case, "it is clear that a bargaining agent which denies membership to Negro members of a craft which it represents cannot justify in law or in reason the use of its power to force a contract from its employer, the effect of which is to discriminate against the Negro minority which it represents. The effect of racial discrimination is not avoided by basing it ostensibly on some other factor. In City of Richmond v. Deans, 4 Cir., 37 F.2d 712, we held that a zoning ordinance which in effect discriminated on grounds of race would not be upheld merely because it was based on the legal prohibition of inter-marriage, which was itself based on racial grounds. So here discrimination against Negro employees cannot be sustained merely because it purports to be based on promotability, which is itself based on race. The fact that the railroads have discriminated against Negroes in the matter of promotability, does not justify the Brotherhood, which represents them as bargaining agent, in making a further discrimination based on that discrimination. Because the railroads do not permit Negroes to hold the position of engineer, is no reason why a bargaining agent representing them should use its bargaining power to deprive them of desirable positions as firemen which the railroads

do permit them to hold. This seems so elementary as not to permit of argument."

The effort of this Brotherhood to discriminate against the Negro firemen on the ground of race in the agreement of February 18, 1941, has been thrice before the Supreme Court. Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Tunstall v. Brotherhood of Locomotive Firemen and Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187, and Graham v. Brotherhood of Locomotive Firemen & Enginemen, 338 U.S. 232, 70 S.Ct. 14, 15. In the last of these cases the Supreme Court said: "The complaint alleges in substance that the Brotherhood is an exclusively white man's union and, as it includes a majority of the craft, it is possessed of sole collective bargaining power in behalf of the entire craft including the Negro firemen in consequence of the Railway Labor Act [45 U.S.C.A. § 151 et seq.]. It has negotiated agreements and arrangements with the southern railroads which discriminate against colored firemen, who are denominated 'not-promotable' while white ones are 'promotable.' The effect of the agreements is to deprive them, solely because of their race, of rights and job assignments to which their seniority would entitle them. Many Negro firemen have been thus displaced or demoted and replaced by white firemen having less seniority. * * * It is needless to recite additional details of the present case. What it adds to the governing facts of the earlier cases is a continuing and willful disregard of rights which this Court in unmistakable terms has said must be accorded to Negro firemen."

In the Steele case, supra, the court had laid down the duty of a bargaining agent to represent fairly the members of the craft for whom it bargains and had unequivocally condemned any discrimination based on race, saying: "We think that the Railway Labor Act imposes upon the statutory representative of a craft at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates. Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents, cf. J. I. Case Co. v. National Labor Relations Board, supra, 321 U.S. [332] 335, 64 S.Ct. [576] 579 [88 L.Ed. 762], but it has also imposed on the representative a corresponding duty. * * * Without attempting to mark the allowable limits of differences in the terms of contracts based on differences of conditions to which they apply, it is enough for present purposes to say that the statutory power to represent a craft and to make contracts as to wages, hours and working conditions does not include the authority to make among members of the craft discriminations not based on such relevant differences. Here the discriminations based on race alone are obviously irrelevant and invidious. Congress plainly did not undertake to authorize the bargaining representative to make such discriminations." [323 U.S. 192, 65 S.Ct. 232.]

■ And we do not think that the action of Negro firemen in seeking and obtaining an injunction in the Palmer case in the District of Columbia was any ground for denying them relief here against the discriminatory provisions of the contract of February 18, 1941. On the contrary, we think that the circumstances which led up to the obtaining of that contract furnish conclusive proof of the hostility of the Brotherhood towards the Negro firemen and utter disregard of their rights on its part. It appears that most of the Negro firemen now remaining in the service of the Southeastern railroads are comparatively old men with long periods of service as firemen, as few Negro firemen have been employed by these railroads since the nineteen twenties, and on the Coast Line the percentage of Negro firemen has dropped from 85 to 35 per cent. These men were employed as firemen, not as engineers, and have passed the period of life when they could qualify themselves for engineers or would be willing to make

such a radical change in their life and habits. They are rendering satisfactory service as firemen and this is the only service that most of them are qualified for. Nevertheless, within a few weeks after the Supreme Court had denied certiorari in the Tunstall case and thus let stand our decision which condemned the agreement of February 18, 1941, discriminating against Negro firemen, the Brotherhood made demand on the Southeastern railroads that they put into effect the "forced promotion" rule against these Negro firemen and discharge all of them who failed to qualify as engineers.[1] As one of counsel for the Brotherhood admitted at the bar of this court, this would have been disastrous to the Negro firemen. It would have meant that practically all of them would have been thrown out of their jobs after years of faithful service. It was to avoid such unfair and discriminatory treatment that the injunction in the Palmer case was sought.

We find no basis for holding that the Negro firemen were unwilling "to do equity" because they sought this injunction. To say that the forced promotion order put all firemen on an equal basis is to shut one's eyes to the real situation which existed and to allow the Brotherhood to make a cruel use of its bargaining power to get rid of the helpless minority whose rights the courts have been attempting to protect. As was well said by Judge Mullins in Mitchell v. Gulf, Mobile & Ohio R. Co., D.C., 91 F.Supp. 175, 181–182:

"I am unwilling to follow a ruling which holds that Negro firemen have failed to do equity by not embracing the proposal of the Brotherhood to subject them to the 'Forced Promotion Rule,' although at first blush it may appear fair to say that all firemen, both white and colored, should be dismissed from service if they cannot qualify for positions as engineers. Such a proposal is deceptive and a mere illusion in so far as these old Negro firemen are concerned because its adoption would only mean that they would lose their jobs as firemen. Such a proposal is but to keep the word of promise to the ear and break it to the hope.

"When this proposal was made to Mr. Thompson, Assistant Vice President of the Railroad, he branded it as an iniquity. I agree with him. He said, 'It is our judgment that practically all, if not all, of the non-promotable firemen now in our service would fail to qualify for promotion, and consequently would be "dismissed from the service." Most of these firemen have been in our service for twenty-thirty-forty years, and to dismiss them now after this long service solely because they are not qualified for promotion (which they never anticipated) would be an iniquity.' (Railroad's Exhibit 8.) Mr. Thompson, when he referred to non-promotable firemen who had been in the service twenty-thirty-forty years, was talking about the colored firemen who are involved in this litigation.

"In lieu of this proposal, Mr. Thompson submitted to the Brotherhood a counter proposal which would have permitted these Negroes to retain their jobs as firemen and unrestrictedly exercise their seniority with all other firemen and helpers until they reached the age of retirement. By its letter of March 15, 1948, the Brotherhood declined to accept the Railroad's counter proposal. If the Brotherhood had accepted this counter proposal, the plaintiffs would have regained their seniority rights which they here seek to have restored. Such action by the Brotherhood would have only recognized equal seniority rights for all members of the craft and might have obviated this litigation. It is a wry anomaly that the Railroad was more concerned about its Negro firemen than the Brotherhood which was under a fiduciary obligation to represent them.

1. This demand was made by the Brotherhood on January 26, 1948, without notice to the Negro firemen and without giving them an opportunity to be heard with respect to the proposal. The question of requiring the Negro firemen to take promotional examinations had been discussed with their representatives early in the preceding year, but conditions which were not acceptable had been insisted upon and nothing further had been done about the matter until the demand of January 26, 1948.

"Mr. Thompson is not alone in his judgment that the proposal suggested by the Brotherhood would cause practically all of these Negro firemen to be dismissed from railroad service. Mr. Lee, the general chairman of the defendant Brotherhood for the Atlantic Coast Line Railroad Company, testified in this case that the adoption of this proposal would probably mean at least 75 per cent of the colored men would lose their jobs as firemen because they could not pass engeineer's examinations.

"In my opinion, the failure of the colored firemen to indorse this plan could not amount to a failure to do equity. On the other hand, the submission of such a plan by the Brotherhood, with knowledge on its part that its adoption could only mean dismissal of these men from the jobs they now hold, does not constitute equitable conduct toward or a fair representation of these old Negro men who, for 20 to 40 years, did back-breaking work on steam locomotives. I cannot censure Negro firemen for going into court to enjoin the negotiation of such a proposal. This is merely an act of self-defense on their part. These Negro firemen are old and will soon pass out of the picture. When one of them was asked before me if he wanted to become an engineer, he replied that it was just 'too late in the evening' for him to become an engineer.

"As Mr. Thompson pointed out, these men never anticipated that they would be required to stand examinations to become engineers. They were hired with the understanding that they could not become engineers, and have never been afforded an opportunity or given any incentive to study and train themselves to be engineers. My decision in this case is not based on the theory that the Railroad is required to promote them to that position. Although they may not be entitled to become engineers, they are entitled to have the courts protect their seniority rights as firemen or helpers during the last few years they will remain in railroad service."

To sum up, these Negro firemen were employed as firemen, not as engineers, and are entitled to just protection as such in any bargaining process in which the bargaining representative whose duty it is to represent them may engage; because they have not been promotable to engineers, they have acquired seniority as firemen which entitles them to desirable runs as firemen in the railway service; the Brotherhood will not admit them to membership because of their race but in the agreement of February 18, 1941, has used its bargaining power to deprive them of the seniority rights which they have earned through years of service; the Brotherhood attempts to justify this invasion of seniority rights on the ground that they stand in the way of the proper training of engineers but the railroad which is charged with responsibility in this matter does not consider such invasion of seniority rights necessary to that end; when stopped by the courts in its efforts to curtail the rights of the Negro firemen, the Brotherhood demands that the railroads adopt a forced promotion rule which will result in eliminating practically all of them from the service. In asking that the adoption of the forced promotion rule be enjoined, the Negro firemen have not done anything which, in our opinion, precludes their being granted relief against the February 18, 1941, agreement which we condemned in the Tunstall case. What relief shall be granted in the Palmer case, is a question for the court before which that case is pending, not for us. Hinton v. Seaboard Air Line Ry. Co., 4 Cir., 170 F.2d 892.

■ The defendant railroad insists that, whatever is done with respect to other matters, the judgment dismissing the suit in so far as it asks damages against the railroad should be sustained. We do not agree. While the evidence does not support the allegations of conspiracy made against the railroad, this is not the end of its liability. As a result of the agreement of February 18, 1941, which we hold to be discriminatory and void, the railroad has failed to accord to certain of the Negro firemen the seniority rights to which they are' entitled and must respond in damages on that account. The void and discriminatory agreement which it entered into with the Brotherhood will no more protect it

than it will protect the Brotherhood from liability for the loss occasioned to those who were injured thereby.

 The defendant Brotherhood challenges the taxation of attorney's fees against it in favor of the plaintiffs Rolax and McGowan. In as much as the whole matter of taxation of costs will be before the lower court when final judgment shall be entered herein, we think it unnecessary to discuss the matter at this time, except to say that under the circumstances here we think that the allowance of attorneys' fees as a part of the costs is a matter resting in the sound discretion of the trial judge. Ordinarily, of course, attorneys' fees, except as fixed by statute, should not be taxed as a part of the costs recovered by the prevailing party; but in a suit in equity where the taxation of such costs is essential to the doing of justice, they may be allowed in exceptional cases. The justification here is that plaintiffs of small means have been subjected to discriminatory and oppressive conduct by a powerful labor organization which was required, as bargaining agent, to protect their interests. The vindication of their rights necessarily involves greater expense in the employment of counsel to institute and carry on extended and important litigation than the amount involved to the individual plaintiffs would justify their paying. In such situation, we think that the allowance of counsel fees in a reasonable amount as a part of the recoverable costs of the case is a matter resting in the sound discretion of the trial judge. See full discussion of the power of equity to award counsel fees by Judge Booth, concurred in by Judge Walter H. Sanborn and Judge Munger, in Guardian Trust Co. v. Kansas City Southern Ry. Co., 8 Cir., 28 F.2d 233, 240 et seq., where the authorities are collected and analyzed. See also Universal Oil Products Co. v. Root Refining Co., 328 U. S. 575, 66 S.Ct. 1176, 90 L.Ed. 1447; Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184; Rude v. Buchhalter, 286 U.S. 451, 52 S.Ct. 605, 76 L.Ed. 1221; and 14 Am.Jur. 45 and note 89 A.L.R. 1093 and cases cited.

For the reasons stated, the judgment appealed from will be reversed and the case will be remanded for further proceedings not inconsistent herewith.

Reversed.