The REPUBLIC OF CAPE VERDE, Plaintiff,

v.

A & A PARTNERS and Joseph M. Aronow, Defendants.

79 Civ. 6569 (RO).

United States District Court, S. D. New York.

Oct. 2, 1980.

Hertzog, Calamari & Gleason, New York City, for plaintiffs.

Joseph M. Aronow, Aronow & Giovinazzi, New York City, for defendants.

## ORDER

OWEN, District Judge.

The report and recommendation of the magistrate are hereby made the order of this Court and the matter is referred back to Magistrate Buchwald to conduct a hearing and determine the fee due plaintiff under the award.

So ordered.

## REPORT AND RECOMMENDATION

NAOMI REICE BUCHWALD, United States Magistrate.

This action was commenced on December 5, 1979. Thereafter, plaintiff moved for partial summary judgment and was successful to the extent that judgment was en-

tered in the sum of $97,500 with interest and costs on its first cause of action.

Thereafter, when the judgment remained unsatisfied, as it does at least in part to the present day, the plaintiff filed a motion for sanctions, including but not limited to attorneys' fees, alleging violations of Rules 11 [1] and 56(g) [2] of the Federal Rules of Civil Procedure. Defendants filed a cross motion on April 9, 1980 requesting the District Court to deny plaintiff's motion for sanctions and

... granting plaintiff's motion for an order to compute the total amount due plaintiff as per order of this court; that the court direct plaintiff to accept defendant's check for said to be computed amount. That upon payment plaintiff be directed to execute and deliver satisfaction of judgment and to cancel Notice of Pendency, to stay enforcement of the Order and Judgment by plaintiff, its agents, attorneys and Sheriff Edward A. Pichler, and for such other and further relief as may be deemed just and proper in the premises herein. [3]

By memorandum and order, dated April 23, 1980, Judge Owen referred plaintiff's motion for sanctions and defendants' cross-motion to me to hear and report.

## FACTS

In the middle of October, 1979, the Republic of Cape Verde engaged the law firm of Van Ginkel & Benjamin to represent it in the purchase of the building located at 13 East 75th Street, New York, New York. [4] A contract signing was scheduled for October 30, 1979. Ambassador Da Luz and his counsel, Robert W. Benjamin, met with defendant Joseph M. Aronow at his office on that date. Mr. Benjamin's affidavit describes the relevant contract signing events as follows:

Just prior to that meeting, Ambassador Da Luz informed me that Chase Manhattan Bank, the financial advisor to the Republic of Cape Verde, had advised him not to proceed with the signing of the contract until an appraisal of the property was completed. This problem was raised with Mr. Aronow at the meeting. Ambassador Da Luz indicated that it would take ten days to complete the appraisal. Mr. Aronow was eager to have the contract signed and suggested that we could resolve the problem by signing the contract and incorporating a new provision into the contract which would allow the Republic of Cape Verde an absolute right of cancellation of the contract without penalty after the completion of an appraisal. The language of this provision was mutually agreed upon and Mr. Aronow inserted the language of the provision at paragraph 6d of the proposed contract. Both Mr. Aronow and Ambassador Da Luz then initialed this provision. The contract (a copy of which is annexed hereto as Exhibit A) was then signed by Ambassador Da Luz on behalf of the

1. Rule 11 provides in relevant part:
   The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay.... For wilful violations of this rule an attorney may be subjected to appropriate disciplinary action.

2. Rule 56(g) states:
   Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees, and any

offending party or attorney may be adjudged guilty of contempt.

3. The record should reflect that an order to show cause containing a temporary restraining order was submitted to the Court seeking the same relief and that it declined to sign the order.

4. This portion of the statement of facts concerning the contract negotiations is taken from the affidavits of Robert W. Benjamin and Robert P. Wesseley, two members of the firm of Ginkel & Benjamin, and the affidavit of Diane Harper, an employee of the firm, submitted in support of plaintiff's motion for summary judgment and not contradicted in defendants' opposing papers.

Republic of Cape Verde and by Mr. Aronow on behalf of A & A Partners. Ambassador Da Luz gave Mr. Aronow a check in the amount of $97,500 as a deposit on the property. (¶ 4).

The contractual provision added read:

6d) Notwithstanding any other provisions to the contrary, the seller does hereby grant to the purchaser the right, which expires at 5 P.M. November 9, 1979 to cancel this contract by giving written notice of rejection of the contract by the Ambassador of the Republic of Cape Verde without any penalty or payment whatsoever. Said notice shall be addressed to Seller and delivered to Seller's attorney, Joseph M. Aronow, Esq., 888 Seventh Avenue, N.Y. 12019.

After the Republic of Cape Verde received an appraisal valuing the property at $650,000, considerably less than the earlier agreed upon sales price of $975,000, its counsel hand delivered a notice by 3:00 P.M. on November 9, 1980, signed by Ambassador Da Luz rejecting the contract and requesting the return of the deposit of $97,-500. (Exhibit A to Wesseley affidavit). On the same day, defendant Aronow acknowledged receipt of the November 9, 1979 letter from Mr. Wesseley (Exhibit B to the Wesseley affidavit). Mr. Aronow advised Mr. Wesseley in his acknowledgement:

Mr. Apfelbaum [Mr. Aronow's partner] is out of town at the present and is expected to return on Monday, November 12th, at which time your letter and notice shall be discussed with him and you shall be advised promptly thereon.

At the hearing before me on May 29, 1980, Mr. Wesseley testified[5] about the events of the ensuing days:

I received no call on Monday. I called him both Tuesday and Wednesday and he finally responded to my call on Wednesday and said, "Look, I haven't had a chance to talk to my client yet. It ap-

pears to me that you are entitled to the money back, but I really need to talk to him about it first," and I said, "I really don't understand why you need to talk to him. It's very clear from the contract that we are entitled to the money back and I really would appreciate knowing whether or not I am going to get a check by the end of this week, which was a week after we were entitled to the return of the check.

\*  \*  \*  \*  \*  \*

If I don't hear from you by this Friday I will have no option but to exercise my legal rights on this—my client's legal rights."

He did not return my call on Friday. I called him again on Friday afternoon and he did not return my call.

The following week we had one final conversation before I turned the matter over to Mr. Simon and at that point again I said, "Look, let's avoid all of the costs and the problems to both of you on this. Why can't we get our money back?" He said, "I have talked to my partner. We think that we are going to give you the money back, but don't pressure us on it. I don't like the way that you have pressured me on this and tried to get the money back on such short notice."

My response was that I had done nothing untoward in terms of pressuring him, I had simply followed our rights under the contract.

(Tr. 55-57).

The Republic of Cape Verde, not having received the deposit back, engaged the firm of Hertzog, Calamari and Gleason as litigation counsel. Mr. Simon, an associate of the firm, upon the firm's retention called Mr. Aronow:

I believe I initiated the phone call to Mr. Aronow and I informed him that I had been retained to recoup these monies and asked him what the problem was; was

---

5. At the outset of the hearing, all counsel present agreed as officers of the court that their statements in response to my factual inquiries would be "as if they were under oath" without the necessity of formal swearing.

All references to the hearing transcript bear the prefix "Tr."

there any reason why the money shouldn't be forthcoming.

He said to me "This matter has been a thorn in my side and while your client had a right to cancel, I have suffered inconvenience here and I have been put to a great deal of trouble and I feel that I ought to have a little something for my trouble. So when I am good and ready you will have your money back."

I said to him "What do you mean? When is the money coming back? If you tell me you will have a check for me next week, fine, but don't—you can't leave me with no date; that when it serves your purpose I will have my money back."

He said, "Look, don't push me. If you want your money you will take it in my good time or if you push me you will," and I quote "sweat blood before you see that money."

I said to him "You will leave me no choice, based on that statement, but to commence a litigation because if you don't give me a date by which you will come up with the money, I can only assume that you have no intention of coming up with the money and to represent my client I have no choice but to commence an action."

(Tr. 47–48).

The return of the deposit was not forthcoming and suit was commenced by the filing of a complaint on December 5, 1979. The complaint contained four causes of action: the first cause of action for breach of contract; the second cause of action for conversion; the third cause of action to foreclose on a lien and the fourth cause of action for punitive damages. An answer was filed on December 31, 1979. It denied most of the allegations of the complaint, but admitted that a contract had been signed (¶ 4), that the Republic of Cape Verde had deposited $97,500 pursuant to the contract (¶ 5) and that:

> The contract, in paragraph 6(d) expressly provided that plaintiff had an option to cancel same and receive back said deposit, as follows:
>
> "Notwithstanding any other provisions to the contrary, the seller does hereby grant to the purchaser the right which expires at 5:00 p. m. *November 9, 1979* to cancel this contract by *giving written notice* of rejection of the contract *by the Ambassador* of the Republic of Cape Verde *without any penalty or payment whatsoever.* Said notice shall be addressed to seller and delivered to seller's attorney, Joseph M. Aranow, [sic] Esq., 888 Seventh Avenue, New York, N. Y. 12019."

(Complaint, ¶ 7) (emphasis in original)

The only affirmative defense raised was the pendency of a state cause of action based on the same facts and commenced earlier.[6]

By notice of motion, dated January 14, 1980 and filed January 15, 1980 plaintiff moved for partial summary judgment on its first cause of action for breach of contract and on the liability aspects of its second cause of action for conversion. Plaintiffs' notice was accompanied by affidavits of Messrs. Benjamin and Wesseley, contract counsel for plaintiff, and by an affidavit of Dianne Harper an employee of the firm attesting to the timely delivery of the cancellation letter. In addition, a statement pursuant to Rule 9(g) of the General Rules of this Court and a memorandum of law was submitted.

Defendants filed an affidavit[7] and a memorandum of law in opposition to the motion for partial summary judgment. Insofar as the affidavit of Mr. Aronow was

---

6. Plaintiff takes the position that no such action was commenced due to an inability to effect service. In any event, on December 28, 1979, the state court action was discontinued. (Reply Memorandum of the Republic of Cape Verde in Support of its Motion for Summary Judgment, footnote at p. 2).

7. The opposing affidavit was not located in the Court file. Both parties agree however that one was served and defendant states that it was filed along with its memorandum. Since neither the memorandum or the affidavit are noted on the docket sheet, it seems likely that the opposing papers were filed with the Court at oral argument and not with the Clerk of the Court.

addressed to factual matters it was limited to the issue of whether the deposit was held in escrow, as it had been described in the November 9, 1979 cancellation letter.[8] Defendants' brief proffered no opposition to the breach of contract aspect of the motion for summary judgment, but rather was limited to (a) a defense of the conversion theory; (b) an assertion that the case should proceed in state court and (c) an allegation that the filing of a lis pendens was improper. No statement in opposition to plaintiff's 9(g) statement was filed.

Oral argument was held on February 1, 1980 and on February 5, 1980 Judge Owen endorsed the motion as "granted with respect to the plaintiff's claim for breach of contract" and denied the motion on the conversion claim. Judgment was entered by the Clerk of the Court on February 20, 1980, following its settlement and signature by Judge Owen on February 15, 1980.[9]

## DISCUSSION

As noted earlier, plaintiff's motion for sanctions is premised on alleged violations of Rules 11 and 56(g) of the Federal Rules of Civil Procedure. Specifically, plaintiff alleges that defendants' answer was filed without belief that there was good ground to support it and was interposed solely for delay in contravention of Rule 11. Similarly, plaintiff submits that the affidavit of defendant (and counsel) Joseph M. Aronow was submitted solely for the purpose of delay in violation of Rule 56(g).[10] Plaintiff stresses the absence of the interposition of any defense in the action on the contract claim and notes that despite defendants'

oft-repeated willingness to tender the return of the deposit that at the time of the motion no portion of the deposit had been forthcoming.[11] Accordingly, plaintiff seeks sanctions including, but not limited to, an award of attorneys' fees and urges that:

It is incumbent upon this Court to take an active role in denouncing and sanctioning those litigants who, without even a colorable claim, engage in unnecessary litigation to earn the high rates of interest available today even at the cost of judgments being entered against them.

Affidavit of William Simon, sworn to March 14, 1980, ¶ 9.

Simply stated, the issue in this case is whether an award of attorneys' fees is appropriate when a plaintiff is clearly entitled to the relief sought, in this case the return of the deposit, and when the defendant, who does not seriously dispute that claim, persists in refusing to return the funds even after judgment is entered in an apparent effort to obtain the benefits of high market interest rates. It is submitted that the conduct of the defendant here should be sanctioned lest similar conduct be encouraged to the detriment of an innocent plaintiff and an already overburdened judicial system. However, while we agree with the plaintiff that sanctions are appropriate, we cannot agree with the theory that plaintiff advances for their imposition.

█ We are constrained to reject plaintiff's claim for sanctions under Rule 11 for the following reasons. First, we note that it would be virtually unprecedented to award attorneys fees as a sanction under

---

**8.** The plaintiff, despite the reference in the November 9, 1979 letter, does not maintain that the funds were held in escrow and did not premise its conversion claim on an escrow theory.

**9.** Costs in the sum of $102.00 were taxed on June 12, 1980 following my direction at the hearing on May 29, 1980.

**10.** Plaintiff also suggests that 28 U.S.C. § 1927 may have been violated as well. That section provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case as to increase costs unreasonably and vexatiously may be required by the court to satisfy personally such excess costs.

**11.** It has been brought to our attention that since the oral argument on this motion that a significant portion of the judgment has been paid. Further, in this connection the record should be clear that at the hearing I indicated that a failure by plaintiff to file a bill of costs or a failure by defendants to pay the judgment would be viewed "very dimly." (Tr. 38).

that rule. The Second Circuit recently assumed in *Nemeroff v. Abelson*, 620 F.2d 339 (2d Cir. 1980) that the issue was an open one and, indeed, we are aware of only one case in which attorneys fees were awarded on a Rule 11 motion. *Kinee v. Abraham Lincoln Fed. Sav. & Loan Ass'n.*, 365 F.Supp. 975 (E.D.Pa.1973). *See generally*, Risinger, *Honesty in Pleading and Its Enforcement: Some "Striking" Problems with Federal Rule of Civil Procedure 11*, 61 Minn.L.Rev. 1, 42–52 (1976). Moreover, while as we discuss below, we do believe that the answer submitted is evidence of defendants' bad faith, it cannot be said that under the circumstances the pleading in its entirety was sufficiently ill-based as to warrant "appropriate disciplinary action." It must be remembered that plaintiff asserted four causes of action and that irrespective of the merits of the first claim for breach of contract, defendants' denials of the second claim for conversion cannot be attacked on good faith grounds given Judge Owen's denial of plaintiff's summary judgment motion directed to that claim. Similarly, with respect to plaintiff's application under Rule 56(g), plaintiff chose to move for summary judgment on the first and second claims. The Aronow affidavit can reasonably be

said to have been submitted to defend against the second claim for conversion on which the Court denied plaintiff's motion for summary judgment. This again precludes a finding that the affidavit was submitted "in bad faith or solely for the purpose of delay." *Super Mold Corp. of California v. James C. Heintz Company*, 318 F.Supp. 286 (N.D.Ohio 1970).

Although in this case an award of attorneys' fees is not warranted under Rules 11 and 56(g), nevertheless, a review of defendants' conduct both prelitigation, pre-judgment and post-judgment, provides ample support for awarding attorneys' fees under the bad faith exception to the American rule.

■ Although under the so-called "American Rule" the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the losing party, there is an exception to the rule when "the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons ....'" [citations omitted] *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975).[12] "'Bad faith' may be found, not

12. In this footnote, we raise and believe dispose of the potential issue under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), of whether it is appropriate to apply the bad faith exception in a diversity case. See *Alyeska Pipeline v. Wilderness Society*, 421 U.S. 240, 259, n. 31, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). The *Erie* rule is grounded on the premise that it would be unfair for the character or result of a litigation to materially differ because the suit is brought in federal court as opposed to state court. *Hanna v. Plumer*, 380 U.S. 460, 467, 85 S.Ct. 1136, 1141, 14 L.Ed.2d 8 (1965). In this case there is no *Erie* problem because the difference between federal and New York practice in awarding attorneys' fees as a sanction against litigation in bad faith is not substantial and because a federal court, even when it sits in a diversity case, can exercise its inherent power to sanction those who abuse its process.

The twin aims of the *Erie* rule are the discouragement of forum shopping and the avoidance of the inequitable administration of justice. *Id.* at 468, 85 S.Ct. at 1142. Insubstantial or trivial variations between state and federal practice are not likely to raise the sort of equal protection problems which troubled the Court

in *Erie* and are also unlikely to influence the choice of a forum. *Id.* Therefore unless the variation between state and federal practice is substantial a federal diversity court need not apply the *Hanna* analysis to determine which practice to follow. In the instant case, the variation between New York and federal practice is not substantial enough to raise an *Erie* problem.

While our research has revealed no New York case which has expressly adopted the bad faith exception (*see City of Buffalo v. J. W. Clement Co.*, 28 N.Y.2d 241, 262–63, 321 N.Y.S.2d 345, 364, 269 N.E.2d 895, 908 (1971)), nevertheless, New York state courts, in exercising their inherent power to regulate litigation and prevent abuses, do award attorneys' fees as a sanction against litigating in bad faith. *See e. g., Dahlem v. Universal School Bus Leasing Inc.*, 35 A.D.2d 992, 318 N.Y.S.2d 117 (2d Dept. 1970) (attorneys' fees awarded where defendants showed laxity and indifference to plaintiff's rights); *Apfelberg v. East 56 Street Plaza, Inc.*, N.Y.L.J., Aug. 21, 1980, at 4, col. 3 (Sup.Ct.N.Y.Co.) (awarding costs against counsel pursuant to the inherent power of the court to supervise the conduct of attorneys appearing

only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973). The underlying rationale for this exception is punitive. *Id.* 412 U.S. at 5, 93 S.Ct. at 1946. The assessment of fees is designed to deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process. *Copeland v. Martinez*, 603 F.2d 981, 985 (D.C.Cir.1979). Recovery of fees, of course, also serves to compensate the prevailing party for costs which should not have been incurred. *Id.*

Attorneys' fees have been awarded to both plaintiffs [13] and defendants.[14] Usually attorneys' fees are awarded to plaintiffs

"when the defendant has unjustifiably put the plaintiff to the expense of litigation in order to obtain a benefit to which the latter is plainly entitled." *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 279, 95 S.Ct. 1612, 1632, 44 L.Ed.2d 141 (1975). For instance, in a seaman's suit for maintenance and cure, the seaman was awarded attorneys' fees because "as a result of the recalcitrance" of his employer he "was forced to hire a lawyer and go to court to get what was plainly owed him." *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88, *reh. den.*, 370 U.S. 965, 82 S.Ct. 1578, 8 L.Ed.2d 834 (1962).[15] The Second Circuit has held that when the bringing of an action "clearly should have been unnecessary

in litigation); *Robinson v. Hall Cab Corp.*, 81 Misc.2d 569, 365 N.Y.S.2d 118 (Civ.Ct.N.Y.Co. 1974) (attorneys' fees awarded where defendant forced plaintiff to go to court to collect a negligence settlement. In fact, in the most recent case dealing with the issue of attorneys' fees, the United States Supreme Court observed that New York courts have inherent power to award attorneys' fees as a sanction against attorneys who engage in improper litigation practices. *Roadway Express, Inc. v. Piper*, 100 S.Ct. 2455, 2464, n.13, 65 L.Ed.2d 488 (June 24, 1980). Therefore, it is likely that had this case been brought in state court and defended in the same manner as it was defended here, the same sanction would have been meted out.

The Third Circuit's opinion in *Montgomery Ward & Co., Inc. v. Pacific Indemnity Co.*, 557 F.2d 51 (3d Cir. 1977) provides the alternative analyses for resolving this issue. First, the Court applied the analysis suggested above. Although it found "no Pennsylvania case which ha[d] applied the 'obdurate behavior' or 'bad faith' exception to the general American Rule ..." it did find civil contempt cases and other analogous cases which suggested that "if the Pennsylvania Supreme Court were to consider the question they would apply the 'obdurate behavior' exception," and upheld the award of attorneys' fees. *Id.* at 59.

An alternative approach to the Erie problem and the "bad faith" exception was suggested in the concurring opinion of Judge Gibbons. Judge Gibbons found that the notions of federalism which underlie the *Erie* rule do not require that a federal forum accept the public policy of the state in which it happens to sit on a matter such as the award of costs (including attorneys' fees) for abuse of its process. *Id.* at 61. Such a matter seems to be well within the "housekeeping rules" of the federal courts which *Erie* has no effect upon. See *Hanna v. Plumer* 380 U.S. 460, 473, 85 S.Ct. 1136, 1145,

14 L.Ed.2d 8. Since it is the federal judicial process that has been abused a federal court should be able to deal with the abuse as it sees fit regardless of the power of the courts of the state where it sits.

Thus, under either approach, there is no question that this court has the power in an appropriate case to sanction the defendant by ordering him to pay the plaintiff's attorneys' fees.

13. See, e. g., *Class v. Norton*, 505 F.2d 123 (2d Cir. 1974); *Stolberg v. Members of the Board of Trustees for the State Colleges of the State of Connecticut*, 474 F.2d 485 (2d Cir. 1973); *Bell v. School Board of Powhatan County, Virginia*, 321 F.2d 494 (4th Cir. 1963).

14. See, e. g., *Copeland v. Martinez*, 603 F.2d 981 (D.C.Cir.1979). *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078 (2d Cir. 1977).

15. Any argument that Vaughn should be confined to its facts is fully rebutted in Mr. Justice Marshall's dissent in *Alyeska*:

Although *Vaughan* was an admiralty case and therefore subject to the possibly narrow reading as a case evincing a special concern for plaintiff seamen as wards of the admiralty court, we have not given the case such a narrow construction. See *Hall v. Cole*, 412 U.S., at 5, 93 S.Ct. at 1946; *F. D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co.*, 417 U.S., at 129 n. 17, 94 S.Ct. at 2165 n. 17. Indeed, the *Vaughan* Court itself relied on *Rolax v. Atlantic Coast Line R. Co.*, 186 F.2d 473 (CA4 1951), a nonadmiralty case in which the plaintiff was awarded attorneys' fees as an equitable matter because of the obduracy of the defendant in opposing the plaintiff's civil rights claim.

421 U.S. at 280 n.4, 95 S.Ct. at 1633.

... and was compelled by the defendants' conduct, counsel fees should have been awarded." *Stolberg v. Members of the Board of Trustees for the State Colleges of the State of Connecticut,* 474 F.2d 485, 490 (2d Cir. 1973) (where a college professor was forced to sue for reinstatement after being discharged for exercising First Amendment rights). *Accord, Class v. Norton,* 505 F.2d 123, 127 (2d Cir. 1974) (where a class of welfare applicants were forced to sue the Connecticut State Welfare Commissioner to compel compliance with a court order calling for timely processing of applications for welfare assistance).

■ According to the Second Circuit's most recent opinion on this subject two elements must be present to award attorneys' fees under the bad faith exception: "there must be 'clear evidence' that the claims are 'entirely without color *and* made for reasons of harassment or delay or other improper purposes.'" *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir. 1980) (quoting *Browning Debenture Holders' Committee v. DASA Corporation,* 560 F.2d 1078, 1088 (2d Cir. 1977)). In the instant case, not only was the defendants' claim "entirely without color" but the defendants in fact failed to advance any defense to the motion for summary judgment on the first cause of action.

Most significant to the "bad faith" analysis is that the plaintiff was compelled to sue to recover a deposit clearly due and owing to it, a matter which was never seriously disputed by defendant prior to or during the litigation. On more than one occasion prior to the litigation, Mr. Aronow acknowledged the existence of the debt. According to Mr. Wesseley, in a conversation, during the second week following the cancellation, Mr. Aronow stated:

> He stated, "I have talked to my partner. We think that we are going to give you the money back, but don't pressure us on it. I don't like the way that you have pressured me on this and tried to get the money back on such short notice."

16. The denials in defendants' answer are discussed *infra.*

(Tr. 57). Mr. Simon's testimony about his conversation with Mr. Aronow after his firm was engaged as litigation counsel quoted above at p. 6 conveys a similar tone.

The validity of the debt was also acknowledged in defendants' answering brief on the summary judgment motion:

> Defendants were given the money to do with as they wished. Only in the event that a sale did not occur was the sum of $97,500.00 to have been returned.... Thus there only exists a debt from defendants to plaintiff, and not an obligation to return the identical $97,500.00, which was given to defendant at contract signing.

Memorandum of A & A Partners and Joseph M. Aronow in Opposition to the Motion for Summary Judgment, p. 3. Moreover, there was no defense [16] advanced to the motion for summary judgment on the first cause of action.

At the hearing, defendants took the position that they could have defended the case on the merits but that as a business matter they had decided not to pursue that approach. Specifically, defendants asserted at the hearing that the clause in question could have been read as providing for a right on the part of Cape Verde *to cancel* without further penalty beyond the forfeiture of the deposit. While not disagreeing that in the abstract the contractual provision at issue might be read in the fashion suggested at the hearing, that interpretation is wholly irrelevant to this case. The defendants who are first advancing this argument in the context of a motion for sanctions know, as was attested to in the affidavits submitted in support of the summary judgment motion and which were not disputed, that this was not the intent of the parties. Indeed, the defendants' answer admitted that the contract provided for the return of the deposit. Defendants' admitted paragraph 7 of the complaint which so interpreted the contract. Paragraph 7 reads:

> The contract, in paragraph 6(d) expressly provided that plaintiff had an op-

tion to cancel same and receive back said deposit, as follows:

"Notwithstanding any other provisions to the contrary, the seller does hereby grant to the purchaser the right which expires at 5:00 p. m. *November 9, 1979* to cancel this contract by *giving written notice* of rejection of the contract *by the Ambassador* of the Republic of Cape Verde ·*without any penalty or payment whatsoever.* Said notice shall be addressed to seller and delivered to seller's attorney, Joseph M. Aranow, [sic] Esq., 888 Seventh Avenue, New York, N.Y. 12019."

In sum, as defendants well knew there was no colorable defense to the contract claim. Nevertheless, defendants compelled the plaintiff to resort to litigation to recover its deposit. This is one of the traditional situations in which attorneys' fees have been awarded under the bad faith exception.

■ Moreover, the answer submitted by defendants is in ·significant part "entirely without color." [17] Defendants denied knowledge or information sufficient to form a belief as to truth of the allegations in paragraph 1 of the complaint which other than allegations about the defendants contained the allegation that "plaintiff is a foreign government." Apparently, that was the only portion of the allegation which defendants challenged. (Tr. 79). That denial does not conform with Rule 8(b), which is also subject to the requirements of Rule 11. A party may not deny knowledge or information of a matter of public record or general public notice. *See, e. g. Nieman v. Bethlehem Nat. Bank,* 32 F.Supp. 436 (E.D. Pa.1939), *aff'd.,* 113 F.2d 717 (3d Cir. 1940); *Porto Transport v. Consolidated Diesel Electric Corp.,* 20 F.R.D. 1 (S.D.N.Y.1956) and 2A *Moore's Federal Practice* ¶ 8.22 (1979).

Defendants admitted only three of the first eleven allegations which comprise the first cause of action and denied the following allegations:

2.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

3.  Venue is proper in the Southern District of New York because defendants are residents of this district.

6.  Pursuant to paragraph 17 of said contract, the $97,500 deposit is made a lien on the premises.

8.  On or about November 9, 1979, plaintiff exercised its option to cancel the contract by letter, a true copy of which is annexed hereto as Exhibit B.

9.  Plaintiff had fully performed all of its obligations under the contract.

10. Thus, plaintiff is entitled to receive back its $97,000 deposit and has duly demanded same.

11. Defendant has acknowledged the propriety of the demand and plaintiff's right to recover back its deposit, but in breach of the contract has refused to return said deposit.

■ It is submitted that defendants have offered insufficient explanations to justify their denial of the allegations of jurisdiction and venue. This is a diversity action within 28 U.S.C. § 1332(a)(4) and venue is clearly proper under 28 U.S.C. § 1391(a). The possibility of state court jurisdiction does not eliminate the authority of the federal courts; concurrent jurisdiction is part of our federal system. 1 *Moore's Federal Practice* ¶ 0.6 [3] (1979). Defendants' explanation for denying paragraph 6 (Tr. 83–84) is contradicted by the admission of paragraph 7. Defendants' response to paragraph 8 was not in compliance with the Fed.R.Civ.P. 8(b) which at a minimum would require them to admit authenticity of the letter. Moreover, their explanation of their response to paragraph 9 is typical of the defendants' cavalier attitude:

"I don't know what was meant in denying that plaintiff had fully performed all of its obligations under the contract except to say I am sure if you give me a half hour to study it I will give you the 42 items that the plaintiff possibly did not comply with . . . ."

---

**17.** The discussion at the hearing on the answer appears at pages 79–92 of the transcript.

(Tr. 90–91). Finally, defendants' explanation of their response to paragraphs 10 and 11 has already been demonstrated to be inconsistent with their admission of paragraph 7.

Finally, the record in this case supplies factual support for the conclusion that defendants acted "for reasons of harassment or delay or other improper motive," the second part of the bad faith test enunciated by the Second Circuit in *Nemeroff*. Despite defendants' repeated assertion that they are ready, willing and able to pay the amount due on the judgment,[18] in fact no actual tender of the judgment amount, $97,500 plus interest, or the deposit sum was ever made prior to the hearing on this motion. (Tr. 10–11). In fact, even after the judgment was entered in the action defendant rolled over the treasury bill or similar instrument.[19] It is submitted that the questioning on this point is revealing of defendants' motivations:

THE MAGISTRATE: How are you going to pay the money next week?

MR. ARONOW: I don't know. I have to call the bank and see if we can cash or sell this ticket. I mean, it's a salable item, but I don't know what the clearing time takes, but whatever it takes, that's the time I will have the funds.

THE MAGISTRATE: Is that a bearer instrument?

MR. ARONOW: It's a bearer instrument, yes. But the mechanics of working out the transfer of the funds—it's very nice to sit here and say yes, we all keep a hundred thousand dollars—they want to impute interest charges and so forth, but it earns interest and in this checking account where you keep all your money and it pays—it's all so simplistic sitting here, but when you go out and if you want to earn interest on the money you have to put it into an instrument and the instrument has dates on it.

THE MAGISTRATE: What kind of treasury bill did you put this money into? My question is at the outset what was the maturity of the treasury bill or instrument and have you rolled it over since then?

MR. ARONOW: It's a 7.55—I don't know what the yield is even.

THE MAGISTRATE: When did you purchase this particular treasury bill?

MR. ARONOW: This was purchased just recently. It says here trade date May 19.

THE MAGISTRATE: So at some point since this judgment was entered the money came back into your possession at which point you could have written a check.

MR. ARONOW: Your Honor, until the matter settled, if I have to bond it all and we will fight it out in the next 22 years, it's all right, your Honor. I am not going—the whole purpose of this thing was they tried a very sharp trick by calling—to try and say I did a criminal act by taking and converting escrow money. These are lawyers who know better.

They then come to me and should have—they give me a story of "We are going to call you back about this. You will be in the office 2:00? I will be there."

Someone comes in saying "Give me the check." He told me don't read the contract, there is no need to read anything, just give us the check.

Then after all this cute stuff and he is threatening to go wherever he is going to go, to authorities, for a minute he was threatening a Cape Verde assassin or something, I didn't know what it was, and then he goes through all this

**18.** Affidavit of Joseph M. Aronow, sworn to on March 24, 1980, ¶ 3, submitted in support of the Order to Show Cause to stay enforcement of the judgment; Affirmation of Joseph M. Aronow, dated April 8, 1980, ¶¶ 5, 6, 12, 22, submitted in opposition to the motion for sanctions. See also, letter of Aronow & Giovinazzi, dated January 31, 1980 to Judge Richard Owen.

**19.** The maintenance of the money in a treasury instrument apparently prevented a settlement of the case prior to the oral argument of the summary judgment motion. (Tr. 73–4).

and I am supposed to say "Oh, thank you, here is your money. Oh, thank you."

\* \* \* \* \* \*

No, your Honor, I am a person. You are not going to do it. And I am not going to say oh, yes, here I come running with the funds for you. They will have their money. I have to give the money back now because I have to clear my title. I was not seeking to keep the money because if I was I will bring you very competent counsel who will tell you for five years they will be in court trying to get the money back and they will probably lose it and the Court will probably say keep half the money and settle it and be wise.

(Tr. 74–77). According to the docket of this Court, no satisfaction of judgment has been filed to this date, although we have been told informally that some substantial payment toward the judgment had been made. We submit that in light of the fact that the deposit of $97,500 was placed in treasury bills or similar instruments which were rolled over at least once since the judgment was entered, the defendants' motivation to obtain high interest rates is clear and clearly improper.

## CONCLUSION

■ Thus, it is recommended that plaintiff be awarded the attorneys' fees which they incurred in prosecuting the First Cause of Action. Should the Court concur, it is further recommended that a hearing be held to determine the amount of the fees due plaintiff under the award.

Copies of this Report and Recommendation have been mailed on this date to all parties, who are hereby reminded that written objections shall be filed with the Court within 10 days after service of this report unless Your Honor grants an extension of time.

DATED: New York, New York
August 28, 1980